**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re | ) BAP No. AZ-15-1319-LJuF |
| | ) |
| JAN MARY WALLACE, | ) Bk. No. 2:13-bk-17237-PS |
| | ) |
| Debtor. | ) Adv. No. 2:14-ap-00332-PS |
| | ) |
| | ) |
| JAN MARY WALLACE, | ) |
| | ) |
| Appellant, | ) |
| | ) **MEMORANDUM**[*] |
| v. | ) |
| | ) |
| THOMAS & WONG GENERAL | ) |
| CONTRACTORS, INC., | ) |
| | ) |
| Appellee. | ) |
| | ) |

Argued and Submitted on September 23, 2016
at Phoenix, Arizona

Filed – October 14, 2016

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Paul Sala, Bankruptcy Judge, Presiding
_____

Appearances:    Ryan Jefferson Works of McDonald Carano Wilson LLP
argued for Appellant Jan Wallace; Bryan Francis
Murphy of Burch & Cracchiolo, P.A. argued for
Appellee Thomas & Wong General Contractors, Inc.
_____

Before: LAFFERTY, JURY, and FARIS, Bankruptcy Judges.

---

    [*]  This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

# I. INTRODUCTION

Debtor Jan Wallace arranged a $1.5 million loan from Appellee Thomas & Wong General Contractors, Inc. ("Thomas & Wong") to BDV Investments, LLC ("BDV"). Although Wallace agreed to act as Thomas & Wong's agent in the transaction, she did not disclose to Thomas & Wong several material facts, including that she had a financial interest in seeing that the transaction was consummated; that one of the guarantors for the loan had an outstanding $1.9 million judgment against him and was thus not a good credit risk; and that she had authorized the release of certain loan proceeds without Thomas & Wong's approval. Wallace also misled Thomas & Wong concerning whether she had personally inspected the primary collateral for the loan.

After BDV defaulted on the loan, Thomas & Wong was able to collect a portion of the debt by realizing on its collateral, but much of the collateral turned out to be worthless, and much of the debt remained unpaid. Thereafter, Thomas & Wong sued BDV and affiliated parties and obtained default judgments but was unable to collect anything from them. Thomas & Wong then sued Wallace in state court for breach of fiduciary duty. The state court ultimately found in favor of Thomas & Wong, entering a judgment against Wallace of $1,306,144 plus interest and costs.

After Wallace filed the instant bankruptcy, Thomas & Wong sought a determination from the bankruptcy court that the state court judgment against Wallace was nondischargeable under

§§ 523(a)(2), (4), and (6).[1]

Although this appeal presents unusual facts and convoluted relationships, the primary issues presented are fairly straightforward: did Wallace fail to disclose to Thomas & Wong material facts that she had a duty to disclose, and was her failure the proximate cause of damage to Thomas & Wong? After a three-day trial, in which the bankruptcy court found most of Wallace's testimony not credible due to her selective memory, the bankruptcy court found the entirety of the state court judgment to be nondischargeable under § 523(a)(2)(A) and partially nondischargeable under § 523(a)(4).

On appeal, Wallace challenges the bankruptcy court's factual findings, including that Wallace was Thomas & Wong's agent, that her failures to disclose were material, that she intended to deceive Thomas & Wong, and that her actions were the proximate cause of damage to Thomas & Wong. Wallace also challenges the bankruptcy court's legal conclusion that a fiduciary relationship existed for purposes of § 523(a)(4). In addition, Wallace questions Thomas & Wong's standing, and argues that the bankruptcy court erred in finding that the § 523(a)(2)(A) claim was not time-barred.

Finding no error of fact or law in the bankruptcy court's decision, we AFFIRM.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

## II. FACTUAL BACKGROUND

The background facts necessary to understand this case are lengthy and discursive, reflecting a complex transaction involving numerous entities, some of which were only peripherally involved in the central events. Because this is a failure to disclose case, it is necessary to examine facts on the penumbra to give context and establish materiality. We therefore explain the background of the main protagonists and their relationships before delving into the chronology of events.

### A. Jan Wallace

Debtor Jan Wallace was a self-described venture capitalist who assisted in funding and management of start-up companies. Wallace and Kelly Black formed an LLC called Wallace Black, LLC in 2005, but the two had done business together since 1998.

### B. John Beardmore and his entities

Black introduced Wallace to John Beardmore in December 2002. Beardmore has several relevant roles and relationships in this matter. He was the principal of BDV; he also owned a company called Beardmore Investments, Inc. Beardmore was negotiating with a private lender, Dumaine Consulting, to obtain financing. Although the ostensible purpose of the financing was to fund BDV's check cashing business, Beardmore had an immediate need for cash to retire debts he owed to Lake Bank. Beardmore owned an interest in the entity that owned Lake Bank, and the outstanding debts were causing regulatory problems. Wallace was brought in to advise Black and another individual regarding proposed bridge financing for BDV. In return, Black promised Wallace a commission of one percent of the funds raised through such a

-4-

facility.

During a December 2002 meeting that included Wallace, Beardmore, Black, and two other individuals, Wallace learned, among other things, that Beardmore was a judgment debtor on a $1.9 million judgment and that he needed funding to resolve loan issues with Lake Bank to ensure that it was in compliance with its banking regulations. At or around the same time, Wallace also contracted with Beardmore to sell MW Asia, LLC, a publically traded shell company, to Beardmore Investments, Inc. for $250,000. A $50,000 deposit was to be paid by January 31, 2003, and Wallace was to receive an interest in a publicly traded company after Beardmore merged an operating company into the shell. Although the MW Asia transaction was a separate transaction from the bridge loan, the funds for the $50,000 deposit were ultimately paid to Wallace from proceeds of the bridge loan that is the subject of this appeal.

**C. Edward Tarapaski**

Edward Tarapaski was employed by Thomas & Wong, a construction company headquartered in Brunei. Tarapaski met Wallace in February 2003 during a visit to Arizona. Because of problems with his hotel arrangements, Tarapaski stayed in Wallace's guest house for some period of time. While there, Tarapaski learned that Wallace was working with Beardmore on obtaining a bridge loan for Beardmore's company.

**D. Negotiations regarding the bridge loan**

Tarapaski was interested in learning more about the transaction and potentially arranging a bridge loan from Thomas & Wong to BDV. Wallace introduced Tarapaski to Beardmore in a

-5-

meeting at the Marriott Shadows Mountain Resort. At the meeting, Tarapaski learned that the $1.5 million loan was necessary to pay off a loan that Beardmore had taken from Lake Bank so that Lake Bank would be in compliance with banking regulations. Tarapaski was advised that the collateral for the 60-day loan would be gold doré, an unrefined gold product. Tarapaski advised Beardmore that he needed assurances about the value of the gold doré and that he wanted possession of the gold to have it tested before making a loan. Beardmore indicated that possession would not be possible, so Tarapaski advised Beardmore and Wallace that there was no basis to move forward.

Two or three days later, Tarapaski met with Beardmore and William Cortegiano, a vice president of BDV, at Houston's Restaurant. Wallace did not attend that meeting. At the Houston's meeting, Tarapaski was offered as additional security the collateral that Lake Bank held for the loan to Beardmore--a second mortgage on Beardmore's Phoenix home, an interest in a stock fund, an interest in shares of stock in a financial company, a car, and a boat. Tarapaski then indicated an interest in moving forward with the transaction.

**E.   Wallace's role in the bridge loan transaction**

After the Houston's meeting, Wallace advised Tarapaski of her experience and expertise in business transactions and that she would assist him in putting the transaction together. Tarapaski and Wallace prepared a checklist of items required before approval of the loan. The loan checklist included due diligence items, including the viewing of the gold doré, obtaining safekeeping receipts from a bonded warehouse in favor

of Thomas & Wong to prevent movement of the gold doré, securing an insurance certificate for the gold, confirmation of other items of collateral, and appointing Wallace to the board of directors of BDV to protect Thomas & Wong's interest with respect to the loan transaction. Thereafter Wallace attended numerous meetings and took numerous actions as an advisor to Tarapaski and ultimately acted as an agent for Thomas & Wong, in certain specific instances, described below.

**F.    Loan terms and documentation**

On March 1, 2003, Wallace and Tarapaski met with Gary Blume, a lawyer with whom Wallace had worked on other transactions. At that meeting Tarapaski, Wallace, and Blume discussed the transaction, including a February 26, 2003 opinion letter from the law firm of DeConcini McDonald Yetwin & Lacy (a copy of which Wallace had obtained), regarding the gold doré. That letter was addressed to A-MARK Precious Metals, Inc. and was in reference to a proposed $35 million loan to BDV. The letter stated the law firm's opinion that BDV held unencumbered title to six containers of precious metal doré, which were warehoused in Lordsburg, New Mexico.

On March 6, 2003, another meeting was held at Blume's office with Tarapaski, Wallace, Beardmore, and Blume in attendance. The parties discussed the transaction and the Lake Bank security that Thomas & Wong would obtain. They agreed that the loan would be for $1.5 million with a flat interest rate of 25 percent, due in 60 days. They also discussed that Thomas & Wong would obtain an interest in an office condominium in Minneapolis, and that Wallace would join the board of BDV to protect Thomas & Wong's

interest. Blume suggested that a promissory note was the best way to protect Thomas & Wong, and Blume was charged with preparing the note. As explained below, the "note" he prepared was not a straight promissory note, but was more akin to a loan agreement.

**G.    The promissory notes**

On March 8, 2003, Wallace, Tarapaski, and Beardmore again met with Blume at his office to pick up the $1.5 million note for execution. The note was signed by the obligor and the guarantors before a notary public at Bank of America later that day.

The note contained various covenants and requirements beyond a mere promise to pay. The covenants provided that the loan proceeds would be used to purchase the secured position of Lake Bank in the above-described collateral and to purchase the office condominium. The note contained a grant of a security interest in gold doré and referenced an insurance certificate that would name Thomas & Wong as loss payee. It also referenced the Articles of Incorporation of BDV and an opinion letter of counsel, all of which were to be attached to the note.[2] However,

---

[2]    The note provides, in relevant part:

BDV represents to the Lender that the proceeds from this loan will be used by BDV to purchase the position of The Lake Bank, N.A. of Two Harbors, Minnesota and the purchase of certain real property describe [sic] as 660 North Second Street, Minneapolis, Minnesota under the terms of a Promissory Note attached as Attachment A, which assets collateralizing the current loan at The Lake Bank will be assigned to BDV.

BDV hereby grants to the Lender, and this
(continued...)

-8-

the exhibits referenced in the note were not attached when Blume gave the note to Tarapaski, Wallace and Beardmore. The note also required BDV to provide copies of the sale documents for the office condo and a safekeeping certificate for the gold doré before any funds would be disbursed. However, no safekeeping certificate was ever provided to Thomas & Wong, and no opinion letter appears to have been prepared at the time the note was executed.[3]

The $1.5 million note also contained the personal guarantees

---

[2](...continued)
Promissory Note is in all things secured by precious metals described on the attached Exhibit A. Attached hereto as Exhibit B is the insurance policy and certificate of insurance (attached in their entirety), insuring the collateral described in Exhibit A and BDV shall cause the Lender to be named as a loss payee on such policy. Attached as Exhibit C to this Promissory Note are the Articles of Incorporation and Certificate of Incorporation of BDV. BDV represents to the Lender that it continues in good standing as a corporation under the laws of the State of Minnesota and will during all relevant times to the completion of the obligations under this Promissory Note. In addition, this Promissory Note is executed in reliance on the attached Opinion Letter of Counsel (Attachment B).

The safekeeping receipt (for the Collateral) shall be in the name of Lender which shall be provided prior to delivery of funds. BDV shall take whatever steps are necessary to insure this transfer is complete. BDV shall provide copies of its Articles of Incorporation, all amendment [sic] thereto, current Bylaws and all minutes of shareholder and board meetings. BDV shall also provide copies of all sale documents for the sale of the real property at 660 North Second Street, Minneapolis, Minnesota.

[3] The note does not specify the subject matter of the opinion letter, and Wallace testified at trial that she could not remember the letter's purpose.

of Beardmore and Cortegiano.

A separate $275,000 note in favor of Thomas & Wong was also executed by BDV. This second note is puzzling in that the $275,000 to purchase the office condo was part of the obligation represented by the $1.5 million note, so its purpose is unclear. Additionally, the creator of the note was unknown. Blume testified that he did not create the $275,000 note although it looked like his form. The $275,000 note contained a provision that BDV's interest in real property would be automatically transferred to Thomas & Wong if the note was not paid within 60 days. The note also provided that L Trust LLC ("L Trust"), a Minnesota limited liability company – the owner of the office condo – consents to the transfer of real property in the event of a default. Unlike the $1.5 million note that was signed on March 8, the $275,000 note did not provide for any guarantees by Beardmore or Cortegiano and did not provide a notary block for any signature. Wallace contends that the $275,000 note was "incorporated" into the $1.5 million note. Although the $1.5 million note referenced an attached promissory note containing the terms under which the office condo was to be purchased, no such note was attached, and Tarapaski never saw the $275,000 note during this time period.

After the execution of the $1.5 million promissory note, Tarapaski and Wallace participated in a series of meetings and telephone conversations about completing the remaining items necessary to satisfy the conditions in the note and on the checklist. As explained below, some of those conditions were never satisfied.

-10-

**H.    The Cane O'Neill account**

After the March 1, 2003, meeting with Tarapaski and Blume, Wallace set up an account in her name at Cane O'Neill, a Nevada law firm with which Wallace had a relationship, to hold in trust the funds to be wired from Thomas & Wong.  Wallace was the client to whom Cane O'Neill associated the account and the person to whom Cane O'Neill looked for instructions.  Wallace agreed to act as Thomas & Wong's agent with regard to releasing the funds from the Cane O'Neill trust account; she was therefore not authorized to release any of those funds without Thomas & Wong's approval.  On March 5, 2003, Thomas & Wong wired $549,980 into the Cane O'Neill account; two days later, it wired another $249,980 into the account, for a total of $799,960.

**I.    Wallace joins BDV's board of directors.**

On March 6, 2003, BDV held a board meeting at The Villages Restaurant in Scottsdale, which was attended by Beardmore, Cortegiano, Wallace and Victor Lee Wark, another BDV board member.  Tarapaski did not attend.  At this board meeting Wallace was appointed to the BDV board for the purpose of protecting Thomas & Wong's interest in the loan transaction, which was understood by Tarapaski, Beardmore, and Cortegiano.  Thereafter Wallace participated in the meeting as a board member.

**J.    BDV provides opinion letter regarding primary loan.**

On March 9, 2003, Tarapaski met with Wallace, Beardmore, and Clark Griffith, the attorney for BDV, to request an opinion letter from Griffith that BDV's multimillion dollar loan from a company named Dumaine Consulting was on track.  Tarapaski understood that the funds from the Dumaine transaction would be

-11-

used by BDV to pay back Thomas & Wong. On March 11, 2003, Griffith sent correspondence to Tarapaski and Wallace confirming that the Dumaine transaction was proceeding forward.

**K. Lake Bank confirms assignment of collateral.**

Following at least two conversations between Wallace, Tarapaski and Tom Kell, the president of Lake Bank, on March 12, 2003, a representative of Lake Bank sent a fax to Wallace confirming that Lake Bank would assign to BDV its liens on Beardmore's home, his 1999 Mercedes, his 2000 18-foot Mystic ski boat, a 22 percent interest in Founders Mezzanine stock fund and stock in Superior Financial Holdings so that BDV could use those assets as collateral for the Thomas & Wong note.

**L. Wallace convinces Tarapaski to move ahead with the loan.**

Sometime between March 10 and March 12, 2003, Tarapaski discussed with Wallace whether to move forward with the transaction given that the gold doré had not yet been viewed. Wallace advised Tarapaski that she thought the transaction should go forward and that Thomas & Wong was protected by a safekeeping receipt, the DeConcini opinion letter and insurance certificates. At the time, however, no safekeeping receipt existed in favor of Thomas & Wong, the DeConcini opinion letter was not in favor of Thomas & Wong, and no insurance certificate was ever issued.

On March 12, 2003, Tarapaski agreed to move forward with the transaction and signed a letter to Michael Cane of Cane O'Neill authorizing Wallace to release the funds from the Cane O'Neill trust account. Thereafter Wallace sent an instruction to Cane O'Neill to transfer $500,000 from the trust account to Lake Bank. Tarapaski left the United States for business in Korea on

-12-

March 17, 2003. Wallace told Tarapaski that she would monitor developments on behalf of Thomas & Wong and would remain in contact with him. Wallace thereafter faxed Tarapaski to reassure him that the permanent loan from Dumaine Consulting was on track for funding.

**M.    The viewing of the gold doré**

Tarapaski and Wallace were to accompany Beardmore to view the gold doré in New Mexico on March 10, 2003, but the viewing did not occur that day. When Tarapaski left Arizona in mid-March, Wallace agreed to view the gold doré for Thomas & Wong. In a telephone conversation in late March 2003, Wallace told Tarapaski the gold had been viewed. Tarapaski understood Wallace's comments to mean that she viewed the gold as she had agreed to do. However, Wallace had not attended the viewing. Instead, representatives of BDV viewed sealed barrels that were never opened at a storage warehouse in Chandler, Arizona.[4] Wallace did not disclose this fact to Tarapaski.

**N.    Tarapaski authorizes the release of the remaining loan funds.**

Based upon his belief that Wallace had viewed the gold, Tarapaski authorized the release of the remaining $700,000 provided for in the $1.5 million note. That $700,000 was wired directly to BDV or Lake Bank by Thomas & Wong and did not go through the Cane O'Neill trust account. Thereafter Wallace faxed a handwritten note to Thomas & Wong's office manager, telling her

---

[4] As noted previously, the DeConcini opinion letter indicated the gold doré was stored in Lordsburg, New Mexico.

that it was imperative that $300,000 be wired to Lake Bank no later than March 31, 2003. The $300,000 transfer and the remainder of the funding for the $1.5 million loans were advanced by the end of April 2003.

**O.  Wallace authorizes the release of funds without Thomas & Wong's knowledge or authority.**

On three occasions during the relevant time period, Wallace authorized the release of funds from the Cane O'Neill account without authorization from Thomas & Wong. On March 6, 2003, after Wallace was elected to the BDV board, she instructed her assistant to request $275,000 be wired from the Cane O'Neill account to Lake Bank, ostensibly to purchase or pay off the office condominium. No loan had been approved by Thomas & Wong at this point, and Tarapaski and Thomas & Wong had no knowledge of the $275,000 note or of the transfer of the funds. The transfer occurred the next day, March 7, 2003. At the March 8 meeting in Blume's office, Beardmore asked Wallace if funds could be released from the Cane O'Neill account to purchase the condo. Tarapaski, who was part of the conversation, refused to release any of the funds, stating that Thomas & Wong was not interested in doing a "condo only" loan. Wallace did not tell Tarapaski that she had already released the $275,000.

Next, on March 21, 2003, Wallace sent an email to Susan Johnson at Cane O'Neill authorizing the release of $20,000 of the Cane O'Neill trust account money to an account titled to L Trust. L Trust was owned by Sokim Lach, Beardmore's girlfriend, who later became his wife. Tarapaski did not know her at the time. L Trust was the entity that had signed the $275,000 note agreeing

-14-

in the event of a default to assign its interest in the property to Thomas & Wong. Tarapaski was unaware of this transfer to L Trust, and neither he nor anyone else at Thomas & Wong ever approved the transfer.

Finally, in August 2003, after BDV had defaulted on the bridge loan, Wallace transferred to Cane O'Neill, without authority from Tarapaski or Thomas & Wong, the remaining $4,960 in the Cane O'Neill account to cover attorney's fees.

**P.    Wallace received $50,000 from the Thomas & Wong loan funds.**

According to Beardmore's testimony,[5] $50,000 of the funds borrowed from Thomas & Wong were used to pay Wallace the deposit to purchase the shell corporation, MW Asia. This payment was not disclosed to Tarapaski. Although Wallace testified that the MW Asia contract terminated when Beardmore did not pay the $50,000 deposit by the January 31, 2003 deadline, she acknowledged receiving the $50,000 from Lake Bank in April 2003.

**Q.    Default and collection efforts**

On May 6, 2003, the $1.5 million note came due and was not paid. Tarapaski authorized Blume and Wallace to take action on Thomas & Wong's behalf to enforce the note. Although Wallace advised Tarapaski that the gold doré had been melted and sold, no gold was ever located, and Thomas & Wong received no funds from the gold. Thomas & Wong thereafter sued BDV and affiliated parties and took default judgments against them.

Wallace assisted Thomas & Wong in efforts to sell the

---

[5] Beardmore did not testify in person at trial. The court admitted Beardmore's deposition testimony from the state court litigation.

judgments to a Richard Kirby for approximately $4.5 million, a transaction that would have netted Wallace $250,000. It is not clear why the offer was so high given that the judgments were against defunct or insolvent companies. The transaction also required certain fees, including an up-front processing fee of $10,000 that was to be paid to Kirby. Tarapaski refused to pay the $10,000. He again refused when Wallace negotiated it down to $5,000 but ultimately consented to pay a $1,500 processing fee to Kirby. However, nothing ever came of the Kirby transaction, and the default judgments were not sold.

Thomas & Wong sought to recover on its Lake Bank collateral. Thomas & Wong recovered approximately $433,000 from the sale of Beardmore's Paradise Valley residence and approximately $20,000 from the sale of some personal property in New Mexico and additional unknown amounts in a lawsuit against Blume. Beardmore's home also contained furniture and personal items that Wallace was able to sell on Thomas & Wong's behalf for approximately $5,000, but Wallace kept those funds over Tarapaski's objection. The shares of the Founders Mezzanine and Superior Financial Holdings Company were worthless. Thomas & Wong received nothing on the office condominium, which was never titled to BDV, and L Trust had apparently encumbered the property with liens to other creditors.

**R.   Thomas & Wong obtains a judgment against Wallace.**

On July 12, 2005, Thomas & Wong instituted litigation against Wallace and Blume in Maricopa County Superior Court for breach of fiduciary duty. On February 7, 2008, the jury returned a verdict in favor of Thomas & Wong. After post-trial motions

and an appeal to the Arizona Court of Appeals, on January 10, 2011, the trial court entered a Judgment Subsequent to Appeal against Wallace, awarding Thomas & Wong $1,306,144 plus taxable costs of $4,026.90 and interest at 10 percent per annum on all sums awarded from February 8, 2008 until paid.

**S.    Wallace files for bankruptcy.**

Wallace filed this chapter 7 proceeding on October 2, 2013. Thomas & Wong filed a timely complaint seeking to except its claim from discharge under §§ 523(a)(2), (4), and (6).  After a three-day trial, the court ruled that the claim was nondischargeable under § 523(a)(2), partly nondischargeable under § 523(a)(4), but dischargeable under § 523(a)(6).

Wallace timely appealed the judgment against her under §§ 523(a)(2) and (4).

### III. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

### IV. ISSUES

1. Did Thomas & Wong have standing to sue Wallace in the bankruptcy court?

2. Is Thomas & Wong's § 523(a)(2)(A) claim barred by any applicable statute of limitations?

3. Did the bankruptcy court err in determining that the debt to Thomas & Wong was excepted from discharge under § 523(a)(2)(A)?

4. Did the bankruptcy court err in determining that a portion of the debt to Thomas & Wong was excepted from discharge

-17-

under § 523(a)(4)?

## V. STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo. Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (citation omitted). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly erroneous. Id. at 574.[6] We are to give "due regard to the trial court's opportunity to judge the witnesses' credibility." Civil Rule 52(a)(6) (incorporated via Rule 7052). We also give deference to inferences drawn by the trial court. Beech Aircraft Corp. v. United States, 51 F.3d 834, 838 (9th Cir. 1995).

The bankruptcy court's conclusions of law regarding nondischargeability, as well as its interpretation of state law, are reviewed de novo. Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420, 426-27 (9th Cir. BAP 2002). The bankruptcy court's

---

[6] At trial, the bankruptcy court admitted several exhibits that Wallace did not include in the excerpts of record. Appellants bear the responsibility to file an adequate record, and the burden of showing that the bankruptcy court's findings of fact are clearly erroneous. Kritt v. Kritt (In re Kritt), 190 B.R. 382, 387 (9th Cir. BAP 1995). An attempt to reverse the trial court's findings of fact requires the entire record relied upon by the trial court be supplied for review. Id. We are entitled to conclude that the missing excerpts are not helpful to Wallace. See Gionis v. Wayne (In re Gionis), 170 B.R. 675, 680-81 (9th Cir. BAP 1994), aff'd, 92 F.3d 1192 (9th Cir. 1996) (table).

-18-

findings on fraudulent intent, reliance, proximate causation and materiality are all subject to review for clear error. Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996).

## VI. DISCUSSION

**A.   Preliminary matters**

**1. Thomas & Wong has standing.**

In both the state court litigation and in the bankruptcy court, Wallace has raised various arguments concerning Thomas & Wong's existence and its standing to litigate the pertinent issues.  The Arizona Court of Appeals rejected Wallace's argument that Thomas & Wong lacked standing to sue in state court because it was a foreign corporation that had not sought authority to transact business in Arizona, as required under Arizona state law, finding that the transactions conducted by Thomas & Wong were exempt from the applicable state statutes.

In the bankruptcy court and this appeal, Wallace argued that Thomas & Wong is a "nonexistent entity" and that the bankruptcy court erred in precluding Wallace from arguing or introducing evidence to that effect.  Wallace notes that the receipts for the wire transfers into the Cane O'Neill account show the originator of the funds as "Wong Kai Min. Chong S. Yen," not Thomas & Wong. Wallace states in her opening brief:

> It remains unclear why Thomas & Wong did not initiate the First Wire Transfer and Second Wire Transfer--as it was the plaintiff in the State Court Action, Bankruptcy Adversary and now Appellee in this appeal, yet it has no apparent financial stake in this matter calling into question its standing.

However, it is undisputed that the state court judgment that

-19-

is the basis for the nondischargeability judgment was entered in favor of Thomas & Wong. In fact, the parties stipulated in their Second Amended Joint Pretrial Statement that

> Thomas & Wong is a judgment creditor of Wallace pursuant to the Judgment Subsequent to Appeal filed January 10, 2011, in proceedings captioned *Thomas & Wong General Contractor, Inc., vs. Blume Law Firm, P.C., et al.*, No. 2 CV2005-051325 in the Superior Court of Maricopa County, Arizona.

Moreover, the bankruptcy court did not disallow testimony or argument on this point. Rather, after Thomas & Wong's counsel objected to Wallace's counsel's questions regarding the location and business of Thomas & Wong on relevance and foundational grounds, and the bankruptcy court questioned relevance, Wallace's counsel withdrew the question and did not make any offer of proof, nor did he return to that line of questioning later in the trial. Trial Transcript, February 26, 2015, pages 144-46. Accordingly, he waived any objection to Thomas & Wong's standing. See In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 992 (9th Cir. 2010) ("an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it").

**2. Thomas & Wong's § 523(a)(2)(A) claim is not time barred.**

On the first day of trial, Wallace's bankruptcy counsel orally moved to dismiss the § 523(a)(2)(A) claim on statute of limitations grounds. The bankruptcy court denied the motion, noting that the issue had not been raised in the parties' Pre-Trial Statement and had not been briefed.[7] The bankruptcy court

---

[7] Under Civil Rule 16(d), a pretrial order "controls the
(continued...)

-20-

indicated that it would consider a properly noticed and briefed motion, but nothing in the record indicates that Wallace's counsel pursued the issue further.

On appeal, Wallace argues that, despite controlling Ninth Circuit authority, the bankruptcy court erred in entering a judgment on the § 523(a)(2)(A) claim because Thomas & Wong did not assert any state law fraud claims during the applicable state law limitations period. Wallace argues that it is unfair for a creditor to be able to assert a fraud claim in bankruptcy many years after the state statute of limitations has expired, when no fraud judgment was previously obtained. Under these circumstances, she contends, witnesses' memories have faded and documents have disappeared, giving an advantage to the "savvy creditor."

In Banks v. Gill Distribution Centers, Inc. (In re Banks), 263 F.3d 862, 868 (9th Cir. 2001), the court held that where a creditor filed a timely state court claim for breach of a settlement agreement – even where the claim had not been reduced to judgment – the creditor was not barred from asserting in the bankruptcy court a timely nondischargeability action for fraud,

---

[7](...continued) course of the action unless the court modifies it." Thus, "a party may not offer evidence or advance theories at the trial which are not included in the order or which contradict its terms." El-Hakem v. BJY Inc., 415 F.3d 1068, 1077 (9th Cir. 2005)(citing United States v. First Nat'l Bank of Circle, 652 F.2d 882, 886 (9th Cir. 1981)). Rule 7016-1 of the Local Bankruptcy Rules for the District of Arizona requires the parties to file a pretrial statement, which we construe as the equivalent of a pretrial order for purposes of controlling the issues to be tried.

breach of fiduciary duty, and willful and malicious injury, even though the state statutes of limitations had expired. See also Lee-Benner v. Gergely (In re Gergely), 110 F.3d 1448, 1454 (9th Cir. 1997) ("The state limitations period for fraud actions is irrelevant to the dischargeability of an established debt.")

Here, it is undisputed that the nondischargeability complaint was timely filed under Rule 4007 and that the state court action for breach of fiduciary duty was also timely filed. Although the passage of time may make it more difficult to try the nondischargeability claim, the timing was tied to the filing of Wallace's bankruptcy.

**B. Merits**

**1. The bankruptcy court did not err in finding the judgment nondischargeable under § 523(a)(2)(A).**

Section 523(a)(2)(A) excepts from discharge debts for money, property, or services obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." A creditor seeking to except a debt from discharge based on fraud must establish by a preponderance of the evidence each of five elements: (1) misrepresentation, fraudulent omission or deceptive conduct; (2) knowledge of the falsity or deceptiveness of such representation(s) or omission(s); (3) an intent to deceive; (4) justifiable reliance by the creditor on the representation(s) or conduct; and (5) damage to the creditor proximately caused by its reliance on such representation(s) or conduct. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010).

A debtor's failure to disclose material facts constitutes a

-22-

fraudulent omission under § 523(a)(2)(A) if the debtor had a duty to disclose and the debtor's omission was motivated by an intent to deceive. See Citibank (South Dakota), N.A. v. Eashai (In re Eshai), 87 F.3d 1082, 1089-90 (9th Cir. 1996). In determining the duty to disclose in the context of fraud under § 523(a)(2)(A), we look to the common law. Apte v. Japra (In re Apte), 96 F.3d 1319, 1324 (9th Cir. 1996) (citing Field v. Mans, 516 U.S. 59, 68-70 (1995)). Under the common law as set forth in the Restatement (Second) of Torts § 551 (1977):

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
>     (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>
>     (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
>     (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
>     (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
>     (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

### a. Wallace is a debtor under § 523(a)(2)(A).

Wallace argues initially that she is not a "debtor" under

-23-

§ 523(a) because the loan was made to BDV, not Wallace. Section 523 provides that a bankruptcy discharge does not discharge an individual debtor from certain enumerated debts. The Bankruptcy Code defines the word "debtor" as a "person or municipality concerning which a case under this title has been commenced." § 101(13). There is no question that Wallace is a "debtor" as that term is used in § 523. In a similar vein, Wallace argues that she never received a commission from the sale of the public shell corporation and thus did not commit fraud. Accordingly, we interpret this argument to be that Wallace did not benefit by her deceptive conduct.

As noted above, testimony at trial established that Wallace received $50,000 of the proceeds from the Thomas & Wong loan. More importantly, liability under § 523(a)(2)(A) is not limited to situations in which the debtor received a benefit from his or her fraudulent activity. Rather, § 523(a)(2)(A) prevents the discharge of all liability arising from fraud. Cohen v. De la Cruz, 523 U.S. 213, 215 (1998); see also In re Sabban, 600 F.3d at 1222 ("[T]here is no requirement that the debtor have received a direct or indirect benefit from his or her fraudulent activity in order to make out a violation of § 523(a)(2)(A).").

> **b. The bankruptcy court did not err in finding that Wallace's failures to disclose amounted to fraudulent misrepresentations.**

As detailed above, Wallace failed to disclose numerous facts to Tarapaski, including that:

- Wallace had an agreement with Kelly Black to receive a commission for arranging the bridge financing.

- Beardmore had an outstanding $1.9 million judgment

-24-

against him.

- A separate $275,000 promissory note related to the purchase of the office condo was prepared and executed.
- Wallace authorized the release of $275,000 from the Cane O'Neill account without Thomas & Wong's authorization.
- Wallace authorized the release of an additional $20,000 and $4,960 from the Cane O'Neill account without Thomas & Wong's authorization.
- Wallace had a contract with Beardmore to sell him a shell corporation, MW Asia, and Wallace received $50,000 from the loan proceeds as a down payment on that contract.

Wallace also misrepresented facts:

- Wallace told Tarapaski that Thomas & Wong was protected by a safekeeping receipt, opinion letter, and insurance certificate.
- Wallace stated that "the gold had been viewed" when she did not personally view the gold doré.

The bankruptcy court found that Wallace had a duty to disclose to Tarapaski and Thomas & Wong material facts regarding the loan transaction arising out of an agency relationship. Agency is the fiduciary relationship that arises when one party, a principal, manifests assent to another person, an agent, that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act. Goodman v. Physical Engineering Inc., 270 P.3d 852, 856 (Ariz. Ct. App. 2011) (citing Restatement

-25-

(Third) of Agency § 1.01 (2006)). An agent holds express authority if there is evidence that the principal has delegated authority by oral or written words that authorize the agent to act or do a certain act or series of acts. Id. The bankruptcy court found that Wallace was Thomas & Wong's agent (1) when Wallace agreed to hold the funds in the Cane O'Neill trust account and to not disburse the funds without Thomas & Wong's consent; (2) when Wallace became a member of the BDV board for the stated purpose of looking after Thomas & Wong's interest; and (3) when Wallace agreed to view the gold on behalf of Thomas & Wong.

The bankruptcy court found that as an agent, Wallace had a duty to disclose material information to Thomas & Wong, including that she stood to benefit from the transaction from the commission agreement she had with Kelly Black and from the sale of the public shell company. The bankruptcy court also found that Wallace had a duty to disclose that Beardmore had a $1.9 million judgment against him, that Wallace had released the $275,000 to Lake Bank without Tarapaski's or Thomas & Wong's consent, that she released the $20,000 to the L Trust without Thomas & Wong's consent, that she did not view the gold when clearly Tarapaski believed that she had, and that she released the last of the initial funds to pay the Cane O'Neill fees.

Wallace argues that the bankruptcy court erred in finding that Wallace was an agent of Thomas & Wong. Wallace contends that Thomas & Wong's "refusal" to demonstrate its corporate existence means that there can be no finding that Wallace was an agent of or defrauded Thomas & Wong. Wallace cites no authority

-26-

for this argument, nor was this issue properly raised in the bankruptcy court; thus, it is waived. See In re Mercury Interactive Corp. Sec. Litig., 618 F.3d at 992. As noted above, in the bankruptcy court, the parties stipulated that Thomas & Wong holds a judgment against Wallace and is a creditor in the bankruptcy, and at trial, Wallace's former counsel withdrew his question regarding Thomas & Wong's corporate existence. Further, the state court memorandum decision notes that Wallace admitted to being Thomas & Wong's agent for the purpose of releasing funds from the Cane O'Neill account. Wallace's testimony in the bankruptcy court was consistent with this finding. See Trial Transcript, February 26, 2015, at 118:18-120:7.

Wallace also argues (1) that the premature transfer of the $275,000 was not material and that Thomas & Wong ratified that transfer; (2) the only evidence of Wallace's knowledge of the $1.9 million judgment was a handwritten note stating "$1.960"; and (3) that Wallace was not required to view the gold doré pursuant to the checklist.

The ratification argument was not raised at trial and is thus waived. In any event, there is no basis to conclude that Tarapaski ratified the premature transfer. As discussed below, the bankruptcy court found that Tarapaski would not have authorized the transaction had he known some of the funds had been released without permission. "Ratification requires intent to ratify plus full knowledge of all the material facts." United Bank v. Mesa N. O. Nelson Co., Inc., 590 P.2d 1384, 1386 (Ariz. 1979). Here, Tarapaski did not have full knowledge of all the material facts: he authorized the release of funds based on

misrepresentations by Wallace that Thomas & Wong was protected by a safekeeping receipt, the DeConcini opinion letter and insurance certificates. Wallace does not challenge the bankruptcy court's finding that these representations were false.

The finding that Wallace had knowledge of the $1.9 million judgment against Beardmore was not clearly erroneous; at trial Wallace identified a note in her own handwriting made after the December 2002 meeting and conceded that the "$1.960" notation therein referred to the Minnesota judgment against Beardmore; but she also claimed that she could not recall whether she had told Tarapaski about the judgment. Trial Transcript, February 26, 2015, at 45:24-46:7. We note that the bankruptcy court did not find credible much of Wallace's testimony.

The bankruptcy court's finding that Wallace agreed to view the gold doré for Thomas & Wong is not clearly erroneous. Tarapaski testified that Wallace said she would view the gold to verify its existence and represent Thomas & Wong in Tarapaski's absence. Trial Transcript, February 25, 2015, at 61:7-18. Wallace herself testified that she was supposed to participate in the viewing of the gold. Trial Transcript, February 26, 2015, at 70:23-71:2. In any event, the issue is not whether Wallace was contractually required to view it, but that she misled Tarapaski into believing that she had personally viewed it. We find no clear error in the bankruptcy court's finding on this issue.

> **c.    The bankruptcy court's findings that Wallace knew her failures to disclose were deceptive and that she intended to deceive Tarapaski were not clearly erroneous.**

Intent to deceive may be inferred from the totality of

-28-

circumstances. <u>Tallant v. Kaufman (In re Tallant)</u>, 218 B.R. 58, 66 (9th Cir. BAP 1996). The bankruptcy court found that Wallace knew of the deceptiveness of her failures to disclose, and that she intended to deceive Tarapaski "most glaringly" when she did not advise him during the March 8 meeting where Tarapaski refused to authorize the release of $275,000 that she had already authorized disbursement of those funds. The bankruptcy court's finding of intent to deceive was based on the underlying findings that Wallace stood to benefit from the transaction, that Wallace failed to inform Tarapaski of the $1.9 million judgment against Beardmore, that Wallace had prematurely authorized the release of $275,000, and that she misled Tarapaski into believing that she had viewed the gold doré. These findings support the conclusion that Wallace intended to deceive Tarapaski.

Wallace argues that she did not intend to deceive Tarapaski or Thomas & Wong and that she had no motivation to do so because she did not stand to gain anything from doing so. Wallace relies on the bankruptcy court's finding regarding § 523(a)(6) that "[t]here is not a sufficient showing here that Wallace intended specifically to hurt Thomas & Wong. What the testimony seemed to establish is that Wallace wanted for whatever reasons this deal to move forward." However, the cited finding is not that Wallace did not intend to <u>deceive</u>, but that she did not necessarily intend to <u>injure</u> Thomas & Wong. These are two distinct issues; intent to injure is not a required element of a § 523(a)(2)(A) claim.

In her reply brief, Wallace argues that because the contract to sell MW Asia was with Beardmore Investments rather than BDV,

the MW Asia contract did not create a financial incentive for Wallace to deceive Tarapaski to convince him to authorize release of the bridge loan funds. However, Wallace testified at trial that she had a profit motive in securing financing for BDV, including selling the public shell. Trial Transcript, February 26, 2015, 61:4-7. Additionally, Beardmore testified that the Thomas & Wong loan was the only source of payment of the $50,000 deposit (regardless of the fact that the contract was with Beardmore Investments), and Wallace was paid $50,000 from those funds.

Wallace also disputes the bankruptcy court's finding that Tarapaski did not know about the MW Asia contract and that Wallace would receive a commission for arranging the bridge financing from Thomas & Wong. Wallace points to the first two pages of Trial Exhibit 73, which is a September 2, 2005 statement Tarapaski prepared for the Department of Homeland Security in which Tarapaski stated:

> During the course of my stay there [at Wallace's home] I overheard several conversations she had with someone named John Beardmore. I asked her if there was anything I could do to help. She said he owned a bank in Minnesota and was in urgent need of a short term bridge loan and was offering gold dorey [sic] bars as security. In return for arranging this she would be paid a commission.
>
> . . . .
>
> I discussed the loan with Jan Wallace and learned that the Lake Bank would be put into a public company shell that she owned and listed on a stock exchange. She told me there would be a good profit in the shares and we could share that. I told her I knew nothing about starting or running public companies and whatever she made was her deal.

The bankruptcy court did not admit these statements into

-30-

evidence.[8]  Even if it did, the 2005 statements do not impeach Tarapaski's testimony regarding his knowledge at the time he authorized the loan.  To the extent he was aware of a pending transaction regarding the shell corporation, nothing in the statement indicates that Tarapaski understood the details of the transaction or that part of the loan proceeds would be used as a deposit on the sale.

At trial, Tarapaski testified that at the time he authorized the release of the loan proceeds on March 12, 2003, he did not know of the commission or the MW Asia contract.  Trial Transcript, February 25, 2015, at 64:22-65:16.  The bankruptcy court found Tarapaski's testimony credible.

In her reply brief, Wallace complains that, in its brief, Thomas & Wong conflated her contractual relationships with BDV and Beardmore Investments.  She points out that the contract to sell the shell corporation was with Beardmore Investments, not BDV.  Even if Thomas & Wong misstated in its brief that the sale of the shell corporation was to BDV, that statement is not relevant to our review of the bankruptcy court's finding that $50,000 of the funds were paid to Wallace as a deposit on the

---

[8]   The bankruptcy court explicitly admitted only page 3 of this statement.  Trial Transcript, February 25, 2015, at 30:6-7. On the last day of trial the bankruptcy court stated that Exhibit 73 was admitted by stipulation.  Based on the prior explicit admission of page 3 only and the fact that witnesses were not questioned about any other portion of the exhibit, we conclude that the bankruptcy court intended to admit only that page.

purchase of the shell corporation.[9]

Wallace also complains that Thomas & Wong incorrectly states that Wallace had "an interest in a company that would get a commission if the Thomas & Wong loan funded." Wallace argues that the only evidence of a commission is the one percent promised to Wallace for advising Black regarding Beardmore Investments. She contends that the undisclosed profit conduit was Wallace & Black, LLC, which did not exist in 2003, and that Wallace did not own an interest in Premier Funding, the predecessor to Wallace Black. Thus, in Wallace's mind, she had no financial incentive to push the loan through.

However, Wallace testified that she had an agreement with Black whereby Black would share commissions with Wallace in exchange for Wallace's advice. And although Wallace claimed that she was not entitled to a commission with respect to the Thomas & Wong loan, she also testified in response to the question whether she had a profit interest in getting financing for BDV, "[b]ecause I was giving Kelly Black and Casey Strunk advice, Kelly Black told me that she would give me a half of two percent or half of one percent." Trial Transcript, February 26, 2015, at 49:16-21. As we have repeatedly noted, the bankruptcy court did not find Wallace's testimony credible.

Wallace has not shown clear error in the bankruptcy court's

---

[9] At trial in the bankruptcy court, Thomas & Wong's counsel introduced excerpts of Wallace's state court trial testimony that BDV was her client with respect to the shell corporation. Wallace asserted that she had been mistaken in her prior testimony. Trial Transcript, February 26, 2015, at 52:2-23; 53:20-54-9.

finding of intent to deceive.

### d. The bankruptcy court did not clearly err in finding that Tarapaski justifiably relied on Wallace's misrepresentations or that those misrepresentations were the proximate cause of injury to Thomas & Wong.

Nondisclosure of a material fact that one has a duty to disclose establishes the requisite reliance and causation for actual fraud under § 523(a)(2)(A). In re Apte, 96 F.3d at 1323. Thus, "[p]ositive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material . . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." Id. (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972)).

As previously discussed, the bankruptcy court correctly found that Wallace had a duty to disclose and that she failed to disclose to Tarapaski several material facts about the loan transaction. Under the applicable legal standard, these findings are sufficient to establish justifiable reliance and causation. Moreover, the bankruptcy court found that Tarapaski would not have committed Thomas & Wong to the loan transaction had he been told of the $1.9 million judgment against Beardmore or that the $275,000 had been released without his consent.

Wallace argues that Tarapaski did not justifiably rely on Wallace's nondisclosures and that the nondisclosures were not the proximate cause of damages to Thomas & Wong because Tarapaski ratified the release of the $275,000 and authorized release of the remaining funds without all of the required documentation, and because he did not conduct an appropriate level of due

-33-

diligence which would have revealed the judgment against Beardmore. As discussed above, Tarapaski did not ratify the release of funds because he was not aware of all the material facts. Moreover, as shown previously, under the reliance standard applicable to cases involving nondisclosure, the bankruptcy court needed to find only that Wallace failed to disclose material facts. In re Apte, 96 F.3d at 1323. In any event, a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Field, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540 (1976)).

> **e.** **The bankruptcy court did not err in not reducing the amount of the judgment to "credit" Wallace for sums collected on the BDV obligation.**

Regarding damages, Wallace contends that the bankruptcy court should have given Wallace credit for the amounts collected and turned over to Thomas & Wong from the liquidation of collateral. However, the amount of the debt was established in the state court judgment, and no evidence was presented that any further payments were made on that debt after entry of the judgment.

> **2.** **The bankruptcy court did not err in finding that $799,960 of the state court judgment was nondischargeable under § 523(a)(4).**

Section 523(a)(4) excepts from discharge debts that arise from fraud or defalcation while acting in a fiduciary capacity. To prevail on a claim under § 523(a)(4), a plaintiff must prove by a preponderance of the evidence not only the debtor's fraud or defalcation but also that the debtor was acting in a fiduciary capacity when the debtor committed the fraud or defalcation. The

-34-

Ninth Circuit has adopted a narrow definition of "fiduciary." To fit within § 523(a)(4), the fiduciary relationship must be one arising from an express or technical trust that was imposed before, and without reference to, the wrongdoing that caused the debt, as opposed to a trust *ex maleficio*, constructively imposed because of the act of wrongdoing from which the debt arose. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378-79 (9th Cir. BAP 2011) (citing Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986); additional citations omitted).

While the scope of the term "fiduciary capacity" is a question of federal law, the Ninth Circuit has considered state law to ascertain whether the requisite trust relationship exists. Ragsdale, 780 F.2d at 796. For a trust relationship under § 523(a)(4) to be established, the applicable state law must clearly define fiduciary duties and identify trust property. In re Honkanen, 446 B.R. at 379.

Under Arizona law, "the essential elements of a trust are a competent settlor and a trustee, clear and unequivocal intent to create a trust, ascertainable trust res, and sufficiently identifiable beneficiaries." Golleher v. Horton, 715 P.2d 1225, 1231 (Ariz. Ct. App. 1985). The bankruptcy court found that there was an express trust and a clear and unequivocal intent to create a trust relationship: the settlor of the trust was Thomas & Wong, which wired $799,960 into the Cane O'Neill trust account that was in Wallace's name; the trustee was Wallace, who agreed that she would not authorize disbursement of funds without Thomas & Wong's consent. The bankruptcy court found that the trust res was the $799,960 in the Cane O'Neill trust account, and that the

sufficiently identifiable beneficiary was Thomas & Wong, for whose benefit Wallace was acting.

Based on its § 523(a)(2)(A) fraud finding, the bankruptcy court found that Wallace committed fraud while acting in a fiduciary capacity.[10]  Accordingly, the bankruptcy court concluded that the debt was nondischargeable under § 523(a)(4), but only as to the $799,960 that was held in the Cane O'Neill account.

Wallace contends that the bankruptcy court incorrectly applied Arizona state law in determining that a trust existed.[11]  Wallace asserts that a written trust document was required to create a trust, but there is no such requirement under Arizona law.  Wallace also asserts that the trustee of the Cane O'Neill

---

[10]  The bankruptcy court also concluded that Wallace's conduct amounted to fraud under Arizona state law, citing Echols v. Beauty Built Homes, Inc., 647 P.2d 629, 631 (Ariz. 1982) (elements of fraud under Arizona law are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; and (9) his consequent and proximate injury) and Madisons Chevrolet, Inc. v. Donald, 505 P.2d 1039, 1042 (Ariz. 1973) (fraudulent concealment may support a finding of fraudulent misrepresentation).

[11]  Wallace seems to be arguing that the court should have looked to federal law to determine whether a trust existed.  She cites Thornton v. Thornton (In re Thornton), 544 F.2d 1005, 1007 (9th Cir. 1976), which recites the elements of an express trust as (1) sufficient words to create a trust; (2) a definite subject; and (3) a certain and ascertained object or res (citing to 89 C.J.S. Trusts § 22).  To the extent Thornton suggests a federal standard is applied in determining whether a trust exists, that case was clarified in subsequent Ninth Circuit decisions.  See, e.g., Ragsdale, 780 F.2d at 796.

-36-

account was the law firm, not Wallace, but she overlooks the fact that the account was in her name and that she agreed not to authorize disbursement of those funds without the consent of Thomas & Wong. Wallace also points out that the loan funds were wired into the Cane O'Neill account from an entity other than Thomas & Wong but fails to explain how that changes the parties' agreement or understanding, especially where Thomas & Wong was named as the obligee in the $1.5 million promissory note. In short, Wallace has not shown clear error in any of the bankruptcy court's findings with respect to the existence of a fiduciary relationship for purposes of § 523(a)(4).

Wallace also argues that there was no intent to defraud and again refers to the bankruptcy court's finding that there was insufficient evidence to conclude that Wallace intended to harm Thomas & Wong. As noted, this finding is irrelevant to the determination of fraudulent intent.

Finally, the bankruptcy court correctly concluded that only the $799,960 deposited into the Cane O'Neill trust account was nondischargeable under § 523(a)(4), as that is the only identifiable trust res.

## VII. CONCLUSION

Wallace has not shown that the bankruptcy court clearly erred in its factual findings or application of legal standard to those findings. Accordingly, we AFFIRM the bankruptcy court's judgment of nondischargeability under §§ 523(a)(2)(A) and (a)(4).