BEECH AIRCRAFT CORPORATION,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

Stephen EVANGELISTA, Plaintiff,

Personal Injury Plaintiffs' Steering
Committee, Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

The TAUBMAN COMPANY, INC.,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

Nos. 93–16986, 93–17106 and 93–17108.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 16, 1995.

Decided March 28, 1995.

William H. Owen, Owen, Melbye & Rohlff, Redwood City, CA, for plaintiff-appellant, in No. 93–16986.

Luke B. Marsh, U.S. Dept. of Justice, Washington, DC, for defendant-appellee, in No. 93–16986.

Joe R. McCray, Joe R. McCray, A Law Corp., San Francisco, CA, for plaintiff, in No. 93–17106.

Roberta Perkins, Joe R. McCray, A Law Corporation, San Francisco, CA, for plaintiff-appellant, in No. 93–17106.

Lee J. Danforth, Coddington, Hicks & Danforth, Redwood City, CA, for plaintiff-appellant, in No. 93–17108.

Before: SNEED and O'SCANNLAIN, Circuit Judges, and MERHIGE, Senior District Judge.*

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

PER CURIAM.

Beech Aircraft Corporation ("Beech") and other Plaintiffs [1] (collectively "Plaintiffs") appeal the district court's judgment in favor of the Defendant in Plaintiffs' action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. ("FTCA"), seeking indemnity from the United States for monies they paid in settlement for alleged air traffic controller negligence, arising from injuries and damages sustained when a Beech Aircraft crashed into Sun Valley Mall in Concord, California. Plaintiffs also appeal the trial court's decision to exclude certain evidence and testimony.

## I.

On December 23, 1985, shortly after 8:30 p.m., a twin-engine Beechcraft Baron airplane ("Baron") crashed into the Sun Valley Mall in Concord, California. The Baron was piloted by James Graham. At the time of the accident, Graham had just completed a flight from San Luis Obispo to Concord and was attempting to land the Baron at Concord's Buchanan Field. Graham ran a local "fixed base operation" at Buchanan Field. The litigation that is the subject of this appeal arises out of the accident and the alleged negligence of the air traffic controllers in handling the attempted landing.

On approach to the Concord area, the Baron first received air traffic control services from the Oakland Air Route Traffic Control Center and Travis Air Force Base Approach Control ("Travis"). Airplanes intending to land at Buchanan Field obtain clearance for approach to Buchanan Field from Travis, but obtain clearance for landing from the local controller in the Concord Tower at Buchanan Field. Concord Tower is not equipped with radar, and the controllers in the tower cannot track an airplane unless it is visible to the eye.[2]

Buchanan Field has two runways, labelled 19R and 1L, and there are different landings that a pilot may make on each runway depending upon weather conditions. Pilots may either obtain clearance to fly straight in to runway 19R or obtain clearance to circle to land on runway 1L.

On the straight-in landing, the pilot uses instruments to guide him until he can make visual contact with the runway, at which time he shifts to visual flying. If the pilot, in making his descent, does not see the runway when he has descended to an altitude of 340 feet above mean sea level (320 feet above ground), he must cease his descent and fly at that altitude until he can see the necessary visual cues to guide him to the runway and can descend further. When the pilot reaches a certain point over the threshold of the runway (the "Missed Approach Point" or "MAP"), if he has not seen the necessary cues, the pilot has missed the opportunity to execute a straight-in landing, and he must execute the published missed approach procedure. That procedure involves an immediate climbing left turn to 2,500 feet above mean sea level to set up to re-attempt the same approach or begin another approach.

The other type of landing performed at Buchanan field requires the pilot to circle the airport and land on runway 1L. In order to execute this landing, the pilot flies towards the threshold of runway 19R as if to make a straight-in landing and then, at or before the beginning of runway 19R, makes an aggressive left turn to the east. This landing requires one mile horizontal visibility and requires vertical visibility up to a minimum of 580 feet above mean sea level. Additionally, the pilot must be able to keep the runway in sight during the circling maneuver.

Plaintiffs contend that the controllers at Concord Tower had, for some time, condoned an illegal practice and permitted pilots to execute a third type of landing. According to Plaintiffs, pilots landing at Buchanan field who miss the approach for a straight-in landing on 19R often attempt to convert such a landing into an illegal circle-to-land landing instead of executing missed approach procedure. Plaintiffs allege that a pilot attempting this illegal procedure would contact Con-

---

1. The other parties who have appealed are the personal injury plaintiffs ("PSC Plaintiffs") and the Taubman Company ("Taubman").

2. Thus, Concord Tower is a "visual flight rules" ("VFR") tower.

cord Tower and explain that he had missed the opportunity to land on 19R and request clearance to circle to runway 1L. Plaintiffs argue that the controllers had made it a standard practice to grant such clearance even if the visibility minimums were insufficient for a circle-to-land landing.

On the night of the accident, when the Baron neared Buchanan Field, Travis cleared the aircraft for approach to runway 19R. Graham then contacted Concord Tower, and the controllers cleared him for a straight-in landing on 19R. The weather conditions at that time were such that visibility was up to 400 feet above mean sea level. The dispute in the lawsuit centers over what type of landing Graham attempted and who caused him to make such an attempt. Principal issues in the proceeding below were whether the controllers, in fact, habitually allowed the aforementioned illegal landing to go on, whether Graham knew of it, and whether Graham was attempting to execute it on the night of the accident.

While it is undisputed that the Baron flew over the missed approach point for runway 19R, the parties disagree over what happened next. Normally, communications between the tower and the Baron would have been recorded and there might have been irrefutable evidence as to Graham's intentions. On the night of the accident, however, the tower's recording equipment malfunctioned, and the transmissions were not recorded clearly. All of the transmissions from the tower to the Baron were preserved, but the equipment did not pick up Graham's transmissions to the tower.[3] The controller responsible for communicating with the Baron, Michael Snyder, testified he heard Graham's responses to his transmissions loud and clear.

After Graham flew over the missed approach point for runway 19R, Snyder testified that he heard Graham declare a missed approach. Within 24 hours of the accident, both Snyder and ground controller Ron Attard filled out reports reflecting that Graham had declared a missed approach. Regardless

of Graham's transmissions to the tower, it is undisputed that Snyder radioed Graham to "contact Travis departure." Such a transmission is consistent with a declaration of a missed approach.

The parties dispute what happened next, but the trial judge found that the Baron flew overhead within view of the tower and continued straight ahead to a point almost two miles south of the tower, then entered into a right descending spiral and crashed into the Sun Valley Mall. The trial judge also found that after passing the tower, the Baron accelerated and retracted its landing gear, actions which are inconsistent with the illegal circle-to-land approach.

The ground victims injured by this accident and mall store owners who sustained property damage filed suit in California state court against Graham, Beech, the maker of the airplane engines, the company which owned and maintained the Baron, the city of Concord and Taubman.[4] The case went to trial, but before it could be submitted to a jury, Beech, Taubman and the estate of the pilot settled. The maintenance company was found not liable. The United States was not a party to this litigation.

Subsequently, the PSC Plaintiffs brought suit against the United States for alleged air traffic controller negligence. Beech and other state court defendants brought consolidated actions seeking indemnity from the United States for the money they had paid in settlement.

In preparation for trial, Beech hired two experts to testify as to the contents of the faulty tape of the Baron-to-tower transmissions, one who worked to enhance the tape and one who allegedly deciphered the low-level voice transmissions made by Graham. Prior to trial, the trial judge decided to exclude the testimony of these experts and held that no witness would be allowed to testify as to the contents of the tape. In addition, during closing arguments, the PSC Plaintiffs attempted to admit some worksheets produced by the FBI in its investigation of the

---

**3.** Only some low level inaudible voice transmissions from Graham to the tower were recorded.

**4.** The Taubman Company is the developer of the Sun Valley Mall.

accident and examination of the tapes. The trial judge refused to admit the worksheets.

After hearing all of the evidence at the two week bench trial, the trial judge concluded that "Plaintiffs failed to show either that the Tower's behavior was negligent or that said negligence, if any was a legal or proximate cause of the crash." (D.Ct.Op. of Aug. 6, 1993 at 1, 1993 WL 316232) Plaintiffs challenge the trial court's finding that the air traffic controllers were not negligent as well as the court's placement of the burden of proof on the plaintiffs and the court's application of the standard of proof. In addition, Beech appeals the exclusion of the expert testimony, and the PSC Plaintiffs appeal the exclusion of the FBI worksheets.[5]

## II.

### A. Air Traffic Controller Negligence

After the two week trial, the court determined that the Plaintiffs failed to prove the controllers were negligent and that their negligence was the proximate cause of the accident. Plaintiffs contend that there was overwhelming evidence of air traffic controller negligence and that the district court's judgment for the Defendant in the face of this evidence was clearly erroneous.

The findings of the district court may not be set aside unless they are clearly erroneous such that the reviewing court, on the entire record, is left with a definite and firm conviction that a mistake has been made. Fed. R.Civ.P. 52(a); *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371 (9th Cir.1985); *Smith v. James Irvine Foundation*, 402 F.2d 772, 774 (9th Cir.1968), *cert. denied*, 394 U.S. 1000, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). An appellate court must be especially reluctant to set aside a finding based on the trial judge's evaluation of conflicting lay or expert oral testimony. *Gibbs v. Pierce County Law Enforcement Support*, 785 F.2d 1396, 1402 (9th Cir.1986). The deference due the district court is also given to inferences drawn by the court. *United States v. Schuster*, 734 F.2d

424, 426 (9th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985).

Plaintiffs allege that the air traffic controllers were negligent in two ways: they habitually allowed pilots to perform the illegal circle-to-land, thereby conditioning Graham to attempt it on the night of the accident, and their conduct on the night of the accident was negligent.

In airplane tort cases, general negligence law applies; however "the standard of due care is concurrent, resting upon both the airplane pilot and ground aviation personnel. Both are responsible for the safe conduct of the aircraft." *Spaulding v. United States*, 455 F.2d 222, 226 (9th Cir.1972). In a Federal Tort Claims Act suit, the "whole law" (including choice of law rules) of the jurisdiction where the alleged act or omission occurred governs the rights and liabilities of the parties. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961). In this case, because the crash and the alleged negligence of the controllers occurred in California, California law controls. Under California law, tort plaintiffs cannot recover if there is only a mere possibility that defendant's actions caused the wrong. *Simmons v. West Covina Medical Clinic*, 212 Cal. App.3d 696, 260 Cal.Rptr. 772, 775 (1989); *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal.App.3d 396, 209 Cal.Rptr. 456, 460 (1985).

> There can be many, even an infinite number of possible circumstances which can produce an injury. But a "possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action...."

*Simmons*, 260 Cal.Rptr. at 775 (quoting *Jones*, 209 Cal.Rptr. at 456).

From the memorandum of the district court, it is clear that the trial judge found that Graham was not attempting the circle to land approach on the night of the accident. While the court thought it *plausible* that Graham was attempting this illicit procedure as allegedly conditioned to do so by the controllers, the judge determined that Plain-

---

5. While different plaintiffs appeal on different issues in some instances, in this opinion, plaintiffs all shall hereinafter be referred to collectively as "Plaintiffs."

tiffs did "not provide[ ] sufficient evidence that this theory is more plausible than any number of alternate theories presented by the Defendant, all of which suggest no negligence on the part of air traffic controllers." (D.Ct.Op. of Aug. 6, 1993 at 5, 1993 WL 316232).

In support of its conclusion that Graham was not attempting the illegal approach, the district court observed that pilots are trained to follow the missed approach procedure upon missing an approach. The evidence was undisputed that Snyder instructed Graham to "contact Travis departure." This transmission implicitly instructed Graham to fly the missed approach procedure and raised the inference that Graham declared a missed approach. Additionally, Snyder testified that Graham declared a missed approach and did not request new clearance to land. It was undisputed that pilots attempting the illegal landing always requested new clearance before attempting it. Moreover, there was testimony that the flight path, location, configuration, position and altitude of the Baron just after missing the approach to 19R were inconsistent with a circle-to-land approach and were not inconsistent with a Beech Baron aircraft generally executing the missed approach procedure.

Plaintiffs challenge the determination of the district court that Graham was not attempting to perform the circle-to-land landing on the night of the accident. However, such a determination must stand unless review of the record leaves this court with the definite and firm conviction that a mistake has been made. *United States v. United States Gypsum*, 333 U.S. 364, 393–95, 68 S.Ct. 525, 542, 92 L.Ed. 746, *reh'g denied*, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948).

While there may be some evidence that the Baron performed the circle-to-land, and there may be some doubt as to whether the Baron was attempting to execute the missed approach procedure, there was clearly evidence that the Baron's maneuvers on the

night of the accident were inconsistent with the alleged illegal practice. The trial judge was obviously in a better position than we to evaluate this evidence, and we find no justification to disturb the finding of the trial court. Thus, in accord with the evidence before it, the trial court, despite Plaintiffs' contention, was not bound to determine whether an illegal landing was common practice at Buchanan Field; indeed, evidence of such a practice would be irrelevant to this litigation.[6]

■ We must now consider whether the controllers' actions were negligent in some other regard on the night of the accident. Plaintiffs argue that once the Baron missed the approach point for the straight-in landing, it was or should have been obvious to the controllers that Graham was not executing the missed approach procedure. When the Baron flew over the tower, urge Plaintiffs, the controllers should have contacted the Baron to demand clarification of the Baron's intentions, and yet, after the transmission, "Contact Travis departure," there was no communication from the tower to the Baron. Plaintiffs maintain that the failure of the controllers to contact the Baron and to demand that Graham execute the missed approach procedure was a breach of their duty and, thus, negligent. We do not agree.

> Under California law, negligence is either the omission of a person (aircraft tower controller) to do something which an ordinarily prudent person (tower controller) would have done under given circumstances, or the doing of something which an ordinarily prudent person (tower controller) would not have done under such circumstances.

*Sanbutch Properties, Inc. v. United States*, 343 F.Supp. 611, 613 (N.D.Cal.1972). "The Air Traffic Controller (ATC) must perform certain functions necessary to the maintenance of a high degree of aviation safety, yet the pilot is burdened with the ultimate responsibility for the prudent handling of his aircraft." *Richardson v. United States*, 372 F.Supp. 921, 925 (N.D.Cal.1974). Once an

---

**6.** Both in their briefs and in oral argument, Plaintiffs made much of the perceived failure of the trial court to address evidence of the illegal landing practice; however, having determined that Graham was not attempting the illegal landing on the night of the accident, the court was not required to consider evidence that the illegal landing took place on other occasions.

air traffic controller has given clearance to land, it is incumbent upon the pilot to assume responsibility for the proper and safe landing of the craft. *Sanbutch,* 343 F.Supp. at 616. While the duty in an airplane tort case is a concurrent one, resting on both the control tower personnel and the pilots, "under VFR conditions, ultimate responsibility for the safe operations of an aircraft rests with the pilot." *Hamilton v. United States,* 497 F.2d 370, 374 (9th Cir.1974) (holding where the pilot is flying under VFR conditions, it is the pilot's obligation to see and avoid other traffic, even if he is flying with a traffic clearance). Moreover, "controllers are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots." *In re Air Crash at Dallas/Ft. Worth Airport,* 720 F.Supp. 1258, 1290 (N.D.Tex.1989), *aff'd,* 919 F.2d 1079 (5th Cir.), *cert. denied,* 502 U.S. 899, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991). Under these principles of California tort law, we conclude that it was not clearly erroneous for the trial court to find that the controllers did not breach their duty.

The record contains undisputed evidence that the Baron missed the approach point for a straight-in landing on runway 19R and that at some point thereafter, Snyder told Graham to "contact Travis departure." This transmission could indicate that Snyder believed Graham missed the landing and expected him to execute the missed approach procedure. In addition, the controllers at Concord Tower do not have radar, and there was testimony at trial that without radar the controller could reasonably have thought that Graham was attempting to execute the missed approach procedure. In fact, Plaintiffs' own pilot expert testified that upon hearing the tower transmit "contact Travis departure," it would not be reasonable or prudent for Graham to do anything other than the published missed approach procedure. Moreover, the controllers knew Graham and knew that he was an experienced local pilot who was familiar with the area, the airport, and the published missed approach procedure. There is no duty to warn a pilot of a condition of which he would ordinarily know or of which he should be aware based on his training, experience and personal observations. *Neff v. United States,* 420 F.2d 115 (D.C.Cir.), *cert. denied,* 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1969).

We do not suggest that an air traffic controller is not required to take any action to attempt to prevent a crash; however, once Snyder transmitted "contact Travis departure" there was less than one minute before the Baron crashed into the mall, and the Baron would only have been visible to the controllers, operating without radar, for a portion of this period. The evidence in the record supports a reasonable assumption on the part of the controllers that Baron would contact Travis departure and continue to fly in a safe manner. Accordingly, we hold that the district court properly found that the air traffic controllers were not negligent.[7]

### B. Preponderance of the Evidence

Plaintiffs have also raised the argument that the trial court misapplied the principle of preponderance of the evidence. Throughout its opinion, the district court used language consistent with the preponderance of the evidence standard. Thus, Plaintiffs cannot and do not argue that the court applied the incorrect legal formulation for the standard. Plaintiffs' argument on this issue is nothing more than a reiteration of their prior contention that the evidence did not support the trial court's conclusions. Having addressed this aspect *supra,* we find no reason to elaborate on our stated determination. Regardless of the form of Plaintiffs' argument, we are satisfied that the trial court's conclusions were reached from the evidence before it.

### C. Burden of Proof

 The district court clearly, and in our view properly, placed the burden of proving

---

7. Even if the district court erred in determining that the controllers were not negligent, the judgment of the district court should stand because there is ample support in the record for the finding of the trial court that any alleged negligence was not the proximate cause of the crash.

There is no evidence that a transmission from the controllers to the Baron asking for clarification of its intentions or demanding it to execute the missed approach procedure would have averted the crash.

both negligence and causation on the Plaintiffs. Plaintiffs challenge this placement and urge that the burden should have been placed on the United States. This argument was first raised by Plaintiffs in a post trial motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Defendant argues that because this issue was not raised prior to judgment, Plaintiffs are precluded from asserting this theory on appeal. Plaintiffs respond that because the trial court addressed and rejected the contention in the Rule 59(e) motion, this Court may now rule on the issue.

Usually errors not raised in the trial court will not be considered on appeal. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); *Michael–Regan Co. v. Lindell,* 527 F.2d 653 (9th Cir.1975). This Court has held that it "need not consider a claim of error not raised below if the error might have been avoided had the issue been timely raised." *Rainbow Pioneer No. 44–18–04A v. Hawaii–Nevada Investment Corp.,* 711 F.2d 902, 905 (1983).

That Plaintiffs raised the issue in a post-judgment motion does not save this issue for appeal for the Plaintiffs. In *Seamon v. Vaughan,* 921 F.2d 1217, 1220 (11th Cir. 1991), the Eleventh Circuit declined to entertain an argument on appeal because the party failed to present it to the district court prior to final judgment, even though the party made the argument in their motion to alter or amend the judgment pursuant to Rule 59(e). *See Krock v. Electric Motor & Repair Company,* 327 F.2d 213 (1st Cir.) ("Since these were matters that could have been asserted prior to the motion for a new trial, an attempt to claim them in that motion was without effect so far as an appeal was concerned."), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964).

The time for Plaintiffs to object to the allocation of burden of proof was at or prior to trial, when the judge could have remedied the situation if necessary. To raise it only after judgment deprives Defendant of the opportunity to meet a burden they thought was on the Plaintiffs, and leaves open the possibility of a lengthy and expensive retrial. *Cf. Monsma v. Central Mutual Ins. Co.,* 392 F.2d 49, 52 (9th Cir.1968) (holding that rule that no party may assign as error the giving of an instruction unless he objects before the jury retires is designed to bring errors to light while there is still time to correct them without entailing costs, delay and expenditure of judicial resources occasioned by retrial).

Because Plaintiffs could have raised this issue at or before trial and because they have not presented any valid reason for not having done so, we decline to consider Plaintiffs' burden shifting argument.

### D. Exclusion of Expert Testimony

The appellate court reviews a district court's decision to admit or exclude expert testimony for an abuse of discretion. *United States v. Rahm,* 993 F.2d 1405, 1410 (9th Cir.1993). "Generally, a district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous view of the facts." *Id.*

Due to a malfunction in the recording equipment at Concord Tower, the transmissions from the Baron to the tower were not properly recorded, and only communications from the tower to Graham were preserved. Plaintiffs retained two expert witnesses to decipher the tapes. They hired Frank McDermott, an electronic sound enhancement expert with an air traffic controller background, to create and analyze "enhanced" tapes of the faulty transmissions. They also hired Dr. Roger Shuy, an expert in the field of linguistics, to analyze the tapes and decipher what Graham said to the tower using phonetic analysis.

The government challenged the admissibility of the enhanced tapes and any accompanying testimony. The trial court, after listening to the enhanced tapes, stated that it was skeptical of McDermott's methods and held that what the trier of fact can or cannot hear is not a proper subject for expert testimony. Consequently, the court excluded McDermott's enhanced tapes and held that no witness would be able to testify as to the

content of any communications by Graham on the night of the accident.[8] Plaintiffs challenge this ruling on appeal.

■ Under Rule 702 of the Federal Rules of Evidence:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

However, even if testimony may assist the trier of fact, "the trial court has broad discretion to admit or exclude it." *United States v. Aguon*, 851 F.2d 1158, 1171 (9th Cir.1988). This Circuit has outlined four criteria to determine the helpfulness of expert testimony: "1) qualified expert; 2) proper subject; 3) conformity to a generally accepted explanatory theory; and 4) probative value compared to prejudicial effect." *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973).[9]

■ We are of the opinion that the trial court properly excluded the testimony because it did not concern a proper subject for expert testimony. Plaintiffs offered Drs. Shuy and McDermott to testify as to what could be heard in a tape recorded conversation, yet hearing is within the ability and experience of the trier of fact. It is our opinion that the trial judge, who sat without a jury, was in the best position to determine whether anything on the tapes could be heard which might need clarification by experts. Accordingly, we conclude that the trial judge did not abuse her discretion in excluding testimony concerning the contents of the faulty tapes.[10]

## E. Exclusion of FBI Worksheets

■ "The district court has broad discretion in admitting or excluding evidence. Its rulings are reviewed only for an abuse of discretion." *United States v. Dunn*, 946 F.2d 615 (9th Cir.1991) (citing *United States v. Kearney*, 560 F.2d 1358, 1369 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977)), *cert. denied*, 502 U.S. 950, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991).

During closing arguments, Plaintiffs attempted to offer into evidence the handwritten worksheets of Federal Bureau. of Investigation ("FBI") Agent Bruce Koenig. Plaintiffs had not listed these worksheets as an exhibit, nor had they identified Koenig as a trial witness. The trial court found the worksheets inadmissible for lack of foundation.

Plaintiffs offered the worksheets at the last minute, without the benefit of authenticating testimony and without giving the government the opportunity to elicit testimony to place the worksheets in context. There was no foundation laid at trial for the eleventh hour admission of the worksheets, and we hold that it was within the discretion of the trial court to exclude them. *See McGonigle v. Combs*, 968 F.2d 810 (9th Cir.) (holding not abuse of discretion for trial court to rule that plaintiffs could not introduce evidence on issue they had failed to identify in list they were required to file as part of pretrial proceeding), *cert. dismissed*, —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992).

---

8. While this ruling did not specifically reference Dr. Shuy, it effectively excluded his testimony.

9. Although *Amaral* was decided prior to the enactment of the Federal Rules of Evidence, this Court has continued to apply the four *Amaral* factors. *See e.g., United States v. Miller*, 874 F.2d 1255, 1266 (9th Cir.), *reh'g denied*, 884 F.2d 1149 (1989).

10. The Seventh Circuit has faced a similar situation and reached a similar result. *United States v. Devine*, 787 F.2d 1086 (7th Cir.1986), *cert. denied*, 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 107 (1986). In *Devine*, Dr. Shuy offered testimony concerning difficult to hear sections of a tape recorded conversation. *Id.* at 1087–88. Dr. Shuy planned to testify based on auditory and phonetic indicia, i.e. listening skills, and not based on his expertise in understanding the context and dynamics of conversations. The district court excluded Shuy's testimony, concluding that it would "not have given the jury significant help in understanding the evidence or determining a fact in issue, and understanding what is said in a tape recorded conversation is not outside the average person's understanding." *Id.* at 1088. The Seventh Circuit agreed with the reasoning of the district court and affirmed the exclusion of Dr. Shuy's testimony. *Id.*

## III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.