FILED

JUN 4 2019

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. SC-18-1269-KuFB |
| | BAP No. SC-18-1278-KuFB |
| JORDON WALLACE SCHULTZ, | (cross-appeals) |
| Debtor. | Bk. No. 17-01568-LA7 |
| JORDON WALLACE SCHULTZ, | Adv. No. 17-90126-LA |
| Appellant/Cross-Appellee, | |
| v. | **MEMORANDUM**[*] |
| KEYWORD ROCKSTAR, INC.; JON SHUGART; LUKE SAMPLE, | |
| Appellees/Cross-Appellants. | |

Argued and Submitted on May 23, 2019
at Pasadena, California

Filed – June 4, 2019

Appeal from the United States Bankruptcy Court
Southern District of California

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Appearances:    J. Edward Switzer, Jr. argued for appellant/cross-appellee Jordon Wallace Schultz; Patrick N. Downes of Loeb & Loeb LLP argued for appellees/cross-appellants Keyword Rockstar, Inc., Jon Shugart, and Luke Sample.

Before: KURTZ, FARIS, and BRAND, Bankruptcy Judges.

Keyword Rockstar, Inc., Jon Shugart and Luke Sample (collectively, Plaintiffs) filed an adversary complaint against debtor, Jordon Wallace Schultz, objecting to his discharge under § 727(a)(3), (4), (5), and (7).[1] After a trial, the bankruptcy court found in favor of Mr. Schultz on the § 727(a)(3), (4), and (5) claims. However, the court denied his discharge under § 727(a)(7), finding that Mr. Schultz committed a false oath under § 727(a)(4)(A) by undervaluing the customer and lead lists on the schedules of his solely-owned company, chapter 7 debtor JWS Publishing, Inc. (JWS). Mr. Schultz appeals from the bankruptcy court's judgment on the § 727(a)(7) claim. Plaintiffs cross-appeal on the § 727(a)(5) claim.

For the reasons explained below, we REVERSE the court's ruling on the § 727(a)(7) claim and AFFIRM on the § 727(a)(5) claim.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

**FACTS**

**A.    Prepetition Events[2]**

Mr. Schultz, individually and later through JWS, developed advertising webinars and educational videos marketed through the internet, and conducted personal coaching of his customers. Seeking to expand his customer base, Mr. Schultz contacted Mr. Shugart to participate in a joint venture arrangement through JWS, where Mr. Shugart would coordinate and manage the marketing of JWS's products. Their oral agreement and business dealings were facilitated through Skype and text messaging.[3] They agreed to split the profits 50-50 and create a mutually accessible customer and sales database containing email addresses.

Initially, the joint efforts were highly successful. However, sometime in February 2015, Mr. Schultz began having bouts of strange behavior including paranoia, forgetfulness, and deep depression. After seeking medical advice and testing, he was diagnosed with bi-polar disorder, post-traumatic stress disorder (PTSD), and dissociative disorder. Mr. Schultz obtained some relief from medication and by participating in on-going psychiatric therapy. As Mr. Schultz's mental condition became

---

[2] Most of the background facts are taken from the bankruptcy court's memorandum decision.

[3] Mr. Shugart and Mr. Sample are located in Georgia. Keyword Rockstar, Inc. was formed and solely owned by Mr. Shugart.

worse, the partnership's amicability began to suffer.

Sometime in May 2015, Mr. Shugart sold copies of JWS's videos to parties on the customer list without informing Mr. Schultz. Mr. Shugart claimed that he was testing the strength of the customer list. When Mr. Schultz discovered this "test," he reacted as though he had been betrayed and encouraged those who purchased during Mr. Shugart's test to request refunds or reverse purchases through the merchant accounts that financed those purchases.

In a June 2015 face-to-face meeting, Mr. Schultz told Mr. Shugart he was overwhelmed by providing customer service to JWS's customers, creating products (webinars and videos), personally coaching some customers, and doing all the travel necessary to facilitate these activities. He asked Mr. Shugart to take on more customer support responsibilities so that he could focus on preparing and presenting video coaching sessions. Mr. Shugart offered to bring in Mr. Sample, his longtime associate, to take over customer service and other duties. Mr. Schultz agreed, and they set a schedule for periodic accounting to each other and agreed to split the profits three ways.

In July 2015, Mr. Schultz discovered information that he believed showed that either Mr. Shugart or Mr. Sample were marketing copies of his product without permission or accounting for sales. He also discovered that Mr. Sample was not performing any customer services. Thereafter, the

4

parties were unable to do a mutually agreeable accounting and the partnership terminated.

In August 2015, Plaintiffs filed a civil lawsuit against Mr. Schultz, JWS, and others, in the United States District Court, Central District of California (Case No. 2:15-cv-06167-DDP-RAO). Both sides in that lawsuit alleged that the other must provide an accounting, and that the other side breached the contract, violated fiduciary duties, and misappropriated trade secrets. In addition, the ownership of JWS's customer list was disputed. The matter was stayed pending the outcome of this appeal and cross-appeal.

In addition to this litigation, Mr. Schultz became involved in a protracted child custody lawsuit with the mother of his infant son. Then, in October 2016, Mr. Schultz lost virtually everything he owned in a house fire. Combined, these events pushed him into bankruptcy.

## B.    Bankruptcy Events

Mr. Schultz filed a chapter 7 petition on March 22, 2017. Seven days later, he filed JWS's chapter 7 petition. Based on comparable sales, Mr. Schultz valued JWS's customer list at $348.60 ($0.10 per lead) and its lead list at $430.00 ($0.02 per lead) for a total of $778.60.

Plaintiffs filed an adversary complaint objecting to Mr. Schultz's discharge under § 727(a)(3), (4)(A) and (B), (5), and (7), and § 523(a)(4) and

5

(6).[4] Plaintiffs alleged that in Mr. Schultz's personal bankruptcy, he made false oaths under § 727(a)(4)(A) by failing to disclose jewelry (a Rolex watch) with a value of more than $100, and by failing to schedule his Bitcoin account which contained about $30,000. In the § 727(a)(5) claim, Plaintiffs alleged that had a net worth in excess of $4 million during the later stages of the partnership but supposedly became insolvent in March 2017. Plaintiffs maintained that Mr. Schultz failed to satisfactorily explain the loss of his net worth.

Plaintiffs also alleged that Mr. Schultz had made a false oath under § 727(a)(4)(A) in JWS's bankruptcy case by undervaluing its customer list. According to Plaintiffs, the list generated millions in income. Using a revenue-based valuation methodology, Plaintiffs alleged that the list was worth a six or seven figure number. On this basis, Plaintiffs sought denial of Mr. Schultz's discharge under § 727(a)(7).

### 1.    The Trial

The bankruptcy court conducted a four-day trial on the § 727 claims. Five witnesses testified: Mr. Shugart, Mr. Schultz, Benjamin Rucker (Mr. Schultz's accountant), Susanne Morgan (Mr. Schultz's therapist), and Joanna Morales (a paralegal in Mr. Switzer's office who assisted Mr. Schultz with his bankruptcy petitions). Relevant trial testimony is

---

[4] The bankruptcy court deferred ruling on the § 523 claims pending the outcome on the § 727 claims.

summarized below.

## Summary of Mr. Shugart's Testimony

Mr. Shugart, who had worked in the affiliate marketing space since 2008, testified about how sales are made through a webinar. He explained that the webinar is about a one-hour sales presentation of a product and customers are invited to participate by email. According to Mr. Shugart, either the advertiser of the product or an affiliate would send out the email invite. If a customer registered for the webinar, they were consenting to be on the email list, and the sender would know what the consumer was interested in. Mr. Shugart opined that knowing the purchase behavior of the consumers on your list is always "really, really good." He also testified that the customer list contained not only email addresses, but phone numbers and "that kind of thing."

Mr. Shugart then testified about the value of JWS's customer list. Mr. Shugart testified that he was aware of a list that recently sold for $12,000. According to Mr. Shugart, this list was not as "curated" as the JWS list because it did not generate as much income (his understanding was that the list that sold for $12,000 generated $200,000 in sales). Mr. Shugart explained that the JWS list was "curated," meaning that the people on the list spent a lot of money to learn the information Mr. Schultz was selling. Mr. Shugart testified that at least $4 to $5 million was sold to people on JWS's list. By using a revenue based methodology rather than the sales

comparison used by Mr. Schultz in JWS's schedules, Mr. Shugart opined that JWS's customer list was worth at least $1 million.

During Mr. Shugart's testimony, his attorney played a video showing Mr. Schultz at a webinar. There, Mr. Schultz told his customers that if they followed his instructions, they, too, could create a customer email list (as he had done) that generated over $4 million in gross sales, and was worth $1 million.

At another point, when asked if he had any understanding as to how Mr. Schultz could have come up with a valuation of $700, Mr. Shugart testified that there were valuation methods on a per email basis, but he did not know how Mr. Schultz came up with the $700 valuation.

When asked about whether he was aware of any other sales that would be comparable to a sale of JWS's list, Mr. Shugart explained that normally lists like JWS's were not for sale because they are so curated and are proven producers for sales. Therefore, most people do not sell the lists, but give third parties a representative share, typically 50% when sales are made. Mr. Shugart continued: "I can't give you a value on that [JWS] list, because the value is so high. Would someone actually pay for it versus. . . generally they just do a rep share on it and that way it's safer for both parties. It is an expensive purchase if you were to pay what it's really worth."

On cross examination, Mr. Shugart testified further about the $12,000

8

sale that he had previously mentioned. He said he knew the owner of the email list that was sold for $12,000, but did not know the buyer. Mr. Shugart also testified that the broker had told him the list sold for $12,000 after he had turned down the sale. According to Mr. Shugart, the seller of that list owned a company that sends emails.

Other testimony showed that Mr. Shugart had told Mr. Schultz he was fine with him controlling and having the say on the customers, "they will be yours in terms of listening to you." When asked what he meant by that, he replied that whatever emails he would send on behalf of Mr. Schultz would come from Mr. Schultz's voice. Further, Mr. Schultz's face was on the registration page of the webinars. Mr. Shugart thought that in terms of listening to Mr. Schultz, consumers would be more responsive if the emails were coming from his name or voice.

Mr. Shugart also testified that Mr. Schultz "has very erratic behavior," which he saw in May 2015.

On recross, Mr. Shugart testified that in his opinion the value of the list was definitely closer to $1 million than $700. Last, Mr. Shugart testified that he was not an expert on the sale of email lists, but more of a purchaser.

### Summary of Mr. Schultz's Testimony

With respect to the § 727(a)(5) claim and alleged loss of assets, Mr. Schultz testified as to line items on the tax returns for JWS. Most of his answers were "I don't know" and "you'll have to talk to my accountant."

9

Mr. Schultz further testified that his assistant, Sarah, helped him prepare his bankruptcy filing, and that at the time he was on many medications. He answered many of the questions about his bankruptcy filing and the disposition of assets with "I don't remember."

Later, Mr. Schultz testified that he did not understand specific transactions and hundreds of pages of accounting from two to three years ago. He explained that he did not know the difference between a ledger and an income statement and similar concepts. "So again, ask my accountant."

With respect to JWS's schedules, when asked why he listed the internet domain and website of JWS with a value of zero, he replied that he had "abandoned it, no one bought it; and you can still buy it if you want to, and it's sitting out there." When asked "you picked revenue-based" (methodology for the valuation), Mr. Schultz replied: "I don't understand." Later, he again said that he did not know why he picked a revenue-based methodology for the domain. When asked about how he came up with the value for the customer and lead lists using a comparable sale methodology, Mr. Schultz testified that he asked his "buddy," a fellow affiliated marketer, Precious Ngwu, about the value. The testimony further shows that in Mr. Schultz's previous deposition about how he came up with the value, he had responded that he "did not know." Evidently, his discussion with Mr. Ngwu came to him later, but he could not remember when he spoke to

10

Mr. Ngwu.

When shown the exhibit about his video when he valued his email list at $1 million, Mr. Schultz replied that he thought the statement was true "only to me" because he had a relationship with his customers to sell them his products. Mr. Schultz also testified that Virticode, a company which he partially owned, was using the list now and making money.

Finally, Mr. Schultz testified that he did not have a clear memory of filling out the JWS petition paperwork because he was "like a zombie" and it "was a really bad time for [him]."

## Summary of Mr. Rucker's Testimony

Mr. Rucker, a former tax examiner and forensic accountant for the IRS, kept Mr. Schultz's books and had prepared his personal and business tax returns since 2015. Mr. Rucker explained his customs and practices with Mr. Schultz. Mr. Rucker had access to all of Mr. Schultz's bank statements so that he could enter each transaction into Quick Books and then reconcile the accounts. During the entry process into Quick Books, if Mr. Rucker could not tell from the context of the bank statement how to properly classify a transaction, he would ask Mr. Schultz the purpose of the transaction. Any transaction that did not have a known business purpose was booked as a shareholder distribution and not a business transaction. These distributions, which were personal items, did not show up on the income statement and were not deducted on the tax return.

11

Mr. Rucker also explained that a $250,000 transaction on February 4, 2016, was a cashier's check and was for advertising. He testified that he knew this since he would have called Mr. Schultz as part of the classification process to ask him what the transaction was for and he would have booked it based on Mr. Schultz's explanation.

Finally, Mr. Rucker testified that based on his experience as an account and fraud investigator with the IRS, he was extremely confident that Mr. Schultz's books and tax returns were an accurate accounting of his business transactions since January 2015 and, if he had any doubt, he would not have Mr. Schultz as a client. He also opined that compared to the other books and records that he reviewed in his tax practice and cases he reviewed while with the IRS, it was rare that he saw records as meticulous and detailed as Mr. Schultz's and he felt that if Mr. Schultz were ever audited, there would be no tax change involved.

## Summary of Ms. Morgan's Testimony

Ms. Morgan is a licensed marriage and family therapist who had been treating Mr. Schultz since September 2016. She explained that Mr. Schultz was formally diagnosed with bi-polar disorder, PTSD, and dissociative disorder, and that she coordinated his care with his treating psychiatrist.

Ms. Morgan testified that his bi-polar disorder was severe and made worse by stress. She further opined that in both the manic and depressive

12

state, Mr. Schultz's ability to think in a logical fashion and to attend to details was impaired, albeit in different ways.

Ms. Morgan explained that Mr. Schultz qualified for PTSD based on multiple traumas beginning with being abused from a young age in his family of origin, severe bullying as a young child in social settings, and even abuse outside the home. According to Ms. Morgan, the trauma of the house fire and all the events that followed also qualified Mr. Schultz for PTSD. Ms. Morgan opined that for Mr. Schultz, in particular, it affected his memory in that he did not have clear memories of the events themselves.

Ms. Morgan also testified that Mr. Schultz's dissociative disorder complicated things in an "elaborate way." In a nutshell, due to his traumas, Mr. Schultz had distinct differences as to which part of him was in charge and running the show. She testified that Mr. Schultz exhibited eight different personalities.

Ms. Morgan further explained that Mr. Schultz had difficulty filling out forms. It was difficult for him to get through the standard intake forms at her office and, therefore, he needed help from another therapist. Even then, she opined, it was unclear if they were correct. She testified that Mr. Schultz fills out a mood survey every time he has an appointment with her and, sometimes, it looks as though it was filled out by a child. She also testified that he does not always connect the dots, and although she could not speak to every decision, Mr. Schultz had difficulty with concentrating

13

and cognition, and thinking logically.

She also explained that Mr. Schultz's logic was severely impaired when he had taken some of his medications. One medication prohibits driving and another medication impairs cognition. She testified that his medications have been adjusted frequently throughout his care.

## Summary of Ms. Morales' Testimony

Ms. Morales, Mr. Switzer's legal assistant, testified that on a scale of 1 to 10, Mr. Schultz's bankruptcy filings were a 10 with respect to difficulty and accuracy. According to Ms. Morales, this was due to the voluminous information and Mr. Schultz's state of mind. She further explained that Mr. Schultz had lost many of his papers in the fire. Ms. Morales testified that the numerous amendments made to the schedules were due to mistakes and Mr. Schultz's forgetfulness. Ms. Morales also opined that Mr. Schultz was confused a lot and that his assistant, Sarah, could keep Mr. Schultz on schedule, but he definitely needed help.

## C.     Summary of the Bankruptcy Court's Findings

### 1.     Section 727(a)(5)

On this claim, the bankruptcy court found that either Plaintiffs had failed to carry their burden, or that Mr. Schultz had offered credible evidence and explanation. The court noted that the Plaintiffs took issue with Mr. Schultz's ability to explain a number of entries in, for example, the Quick Books for 2016, a document that is some 194 pages in length with 33

lines of entries on each page and over 6,402 entries. The court found that it was true that Mr. Schultz could not explain some of the withdrawal entries. However Mr. Schultz testified that he left a lot of the categorization to his accountant. The court observed that Mr. Rucker corroborated Mr. Schultz's testimony, explaining how he sorted various deposits and withdrawals from JWS's accounts. The court concluded that there was nothing unsatisfactory in Mr. Rucker's explanation.

2. **Section 727(a)(4)(A) via § 727(a)(7)**

The bankruptcy court found that Mr. Schultz grossly undervalued JWS's customer list which constituted a false oath. In reaching this conclusion, the court found that Mr. Schultz's testimony for the low value was not credible. Although Mr. Schultz testified that he asked his "buddy," a fellow affiliated marketer, Mr. Ngwu, about the value, the court observed that there was no information on whether Mr. Ngwu was qualified to opine on value.

Further, although the bankruptcy court had found that the false oaths in Mr. Schultz's personal bankruptcy schedules (the omission of the Rolex watch and the Bitcoin account) were a result of his mental disabilities (e.g. forgetfulness, lack of focus, inability to connect the dots), the court decided that Mr. Schultz deliberately placed a low value on the customer list, purportedly in consultation with his friend. The court decided that Mr. Schultz's conduct in JWS's bankruptcy case was the result of an

intentional act and differentiated its findings as to the false oaths in his personal bankruptcy based on "a commission rather than an omission." The court noted that Mr. Schultz did not claim the valuation of the list was the result of a mistake or inadvertence.

The bankruptcy court also considered Mr. Schultz's previous claim in the webinar that his list was worth $1 million. According to the court, Mr. Schultz could have chosen the $1 million valuation but, instead, he chose the $778.60 value from Mr. Ngwu. The court noted that he did not choose a mid-range value, nor did he state the value was unknown. According to the bankruptcy court, it was unreasonable for Mr. Schultz to have chosen the lowest valuation, given that he had touted the list was worth $1 million.

In its findings on intent, the bankruptcy court also relied on Mr. Schultz's sophistication. The court found that Mr. Schultz was "well-educated, experienced and [a] creative participant in the internet marketing field." The court concluded: "He had to have known the list had far more value than he scheduled."

As further evidence of value, the court observed that Mr. Schultz was currently using the customer list to market products to potential customers in his new business and was making money.

Finally, the court agreed with Mr. Shugart's testimony that a customer list containing contact information is not virtually valueless. The

court explained that although Mr. Shugart hesitated to put an exact value on Mr. Schultz's list, he was aware of a "poorly-curated" list that had sold recently for $12,000.

In the end, the bankruptcy court found that Mr. Schultz intentionally undervalued the list to cause the chapter 7 trustee, who had no independent knowledge of the potential value of the list, to abandon it.[5] The court concluded that Plaintiffs carried their burden of establishing that Mr. Schultz made a false oath under § 727(a)(4)(A) in connection with JWS's bankruptcy case and denied his discharge on that basis.

The court entered judgment in favor of Mr. Schultz on all claims, except the § 727(a)(7) claim, which was based on a false oath in JWS's schedules.[6] Mr. Schultz filed a timely appeal from the judgment denying his discharge under § 727(a)(7). Plaintiffs filed a timely cross-appeal, challenging the court's ruling in favor of Mr. Schultz on the § 727(a)(5) claim.

---

[5] The chapter 7 trustee filed her notice of abandonment over a month after JWS filed its petition. According to the notice, the trustee abandoned the customer and lead lists on the grounds that (1) the ownership of the lists was disputed in the on-going litigation between Plaintiffs and Mr. Schultz and (2) the lists contained confidential and proprietary information.

[6] Since the court denied Mr. Schultz his discharge under § 727(a)(4)(A) via § 727(a)(7), the court dismissed the § 523 claims without prejudice in the event its judgment was reversed and the discharge restored.

## JURISDICTION

The  bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court err by denying Mr. Schultz a discharge under § 727(a)(4)(A) via § 727(a)(7) on the basis that he knowingly and fraudulently made a false oath in JWS's bankruptcy schedules by undervaluing the customer and lead lists?

Did the bankruptcy court err when it found that Plaintiffs had not met their burden of proof under § 727(a)(5) and that Mr. Schultz provided a satisfactory explanation about any loss of assets ?

## STANDARDS OF REVIEW

In objection to discharge appeals: "(1) the [bankruptcy] court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo." *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004) *aff'd*, 212 F. App'x 589 (9th Cir. 2006)).

Under § 727(a)(4)(A), whether a debtor made a false oath, whether the false statements were material, and whether the debtor had the

18

requisite fraudulent intent are all questions of fact reviewed under the clearly erroneous standard. *Id*. at 1197. Whether a debtor has satisfactorily explained a loss of assets under § 727(a)(5) is also a question of fact that we review for clear error. *Id.* at 1205.

A factual determination is clearly erroneous if the trial judge's interpretation of the facts is "illogical, implausible, or without support in the record." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 & n.21 (9th Cir. 2009) (en banc).

There are other basic tenets that guide us in application of the clearly erroneous standard of review. A factual determination is clearly erroneous if the appellate court, after reviewing the record, has a definite and firm conviction that a mistake has been committed. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574. In addition, our role in this appeal is not to reweigh the evidence presented to the bankruptcy court and we give due regard to the trial court's opportunity to judge the witnesses' credibility. *Id.* While we give great deference to credibility determinations, they are still subject to our review. We may find clear error if the witness' story is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. *Id.* at 575. We also give deference to inferences drawn by the trial court. *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir. 1995).

# DISCUSSION

## A.     General Considerations

The party objecting to discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. Rule 4005; *In re Retz*, 606 F.3d at 1196. "The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 622 (1993) (citations omitted). "Before any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to prove the truth of the asserted proposition with the requisite degree of certainty." *Id.*

When considering this standard of proof, we are guided by certain general principles governing denial of discharge claims. To effectuate the fresh start policy, a claim for denial of a discharge under § 727 is construed liberally in favor of the discharge and strictly against a person objecting to the discharge. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986). However, the bankruptcy discharge and its opportunity for a fresh start is limited to the "honest but unfortunate" debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

**B.** **The bankruptcy court erred in denying Mr. Schultz's discharge under § 727(a)(4)(A) via § 727(a)(7).**

Section 727 states in relevant part:

(a) The court shall grant the debtor a discharge, unless—

. . . .

> (4) the debtor knowingly and fraudulently, in or in connection with the case–
>> (A) made a false oath or account;
>
> . . . .
> (7) the debtor has committed any act specified in paragraph . . . , (4), . . . of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider . . . .

A plaintiff bringing a claim under § 727(a)(4)(A) must prove that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *In re Retz*, 606 F.3d at 1197 (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)). "To establish a § 727(a)(7) claim based on the same type of conduct, the same elements logically are required, albeit the 'false oath' must be made in another bankruptcy case."[7] *Trainor v. Evans (In re Evans)*, BAP No. CC-16-1356-

---

[7] There is no dispute that Mr. Schultz was an "insider" of JWS and that he caused JWS to value the customer list at $348.60 and the leads list at $430.00, for a total of $778.60.

21

KuFTa, 2017 WL 3429023, at *4 (9th Cir. BAP Aug. 9, 2017).

To meet their burden of proof, Plaintiffs must first show that Mr. Schultz made a false statement in connection with JWS's bankruptcy case. The undervaluation of an asset on the schedules or statement of financial affairs can constitute a false oath. *Weiner v. Perry, Settles & Lawson, Inc. (In re Weiner)*, 208 B.R. 69, 71–72 (9th Cir. BAP 1997) (denying discharge on the basis of undervalued jewelry), *rev'd on other grounds*, 161 F.3d 1216 (9th Cir. 1998).

The bankruptcy court considered several pieces of evidence when determining that the value of JWS's customer list was greater than $700. First, the court emphasized Mr. Schultz's previous claim in the webinar that the list was worth $1 million. Indeed, Plaintiffs' counsel waived the trial exhibit on the webinar like a flag at oral argument before the Panel. However, the court's reliance on this evidence for its determination of "undervaluation" for purposes of a false oath is problematic. Mr. Schultz's opinion about the $1 million value was made at a different time and in a different context. At the webinar where he made this claim, he was selling a product, which included helping his customers build a profitable customer email list. In this context, it was an estimate of how much he could earn from his own list over time because of his relationship with his list customers. Placed in context, if the customer list were offered for sale by the chapter 7 trustee to a third party, it is not obvious from the record

22

what value it would have without Mr. Schultz's involvement.[8] Mr. Schultz's opinion of value at the webinar is not plausible evidence of the list's value in the hands of the chapter 7 trustee.

Next, the bankruptcy court agreed with Mr. Shugart's testimony that a customer list containing contact information is not virtually valueless. The court considered Mr. Shugart's testimony about the "poorly curated" list that had sold for $12,000 as an indicator of value for JWS's customer list. However, Mr. Shugart offered few, if any, details about this sale: he had turned down the offer to buy the list, the list generated about $200,000 in sales, and he "heard" that the list was sold, although he did not know who had bought it.[9] Compared to this list, Mr. Shugart opined that JWS's customer list was worth $1 million or had a "high value" because it generated between $4 and $5 million in sales.

Plainly, the $12,000 sale was not a comparable sale. Indeed, Mr. Shugart testified that he was unaware of any comparable sales. According to Mr. Shugart, purchasers do not buy a list such as JWS's due to the risk of putting up significant cash for a list that may not return the

---

[8] Although Mr. Schultz continues to use the list after it was abandoned by the chapter 7 trustee, we are similarly unable to tell from this record what value the list would have without his involvement.

[9] This testimony, strictly speaking, was "hearsay" within the meaning of Fed. R. Evid. 801, although Mr. Schultz's attorney did not object to its admission on this or any other grounds.

investment, especially when a 50-50 profit sharing arrangement is available. Mr. Shugart does not explain the risks associated with purchasing an email list and it is not apparent that he applied any discount to the value he assigned Mr. Schultz's customer list considering its illiquidity.

In the end, Mr. Shugart's testimony about the value of JWS's customer list was conclusory, implausible, and inconsistent. There were no comparable sales, he was unaware of any lists such as JWS's for sale, and his testimony was that purchasers do not buy a customer list such as JWS's for $1 million because the risk may be greater than the return on investment. In other words, there is little, if any, market for these lists due to risks that he did not fully explain. Furthermore, the chapter 7 trustee's reasons for abandonment — the on going litigation over ownership of the list and the personal and confidential nature of the content of the list — were neither mentioned nor considered in the valuation testimony. The record also shows that Plaintiffs did not attempt to purchase the list from the chapter 7 trustee prior to abandonment, despite their litigation and contention of high value.

In sum, the record contains no competent or plausible evidence that JWS's customer list was worth more in the hands of the chapter 7 trustee than the value scheduled by Mr. Schultz on JWS's schedules. Since we liberally construe a claim for denial of a discharge under § 727 in favor of

the discharge and strictly against a person objecting to the discharge, we are left with a definite and firm conviction that a mistake has been committed. *Anderson*, 470 U.S. at 573. Since Plaintiffs failed to prove a false oath, the burden of proof never shifted to Mr. Schultz to show that his valuation was "more likely than not" correct.

Furthermore, on this record, even if there was a false oath (which was not proven), we conclude that the bankruptcy court's finding that Mr. Schultz knowingly and fraudulently undervalued JWS's customer list was clearly erroneous. In connection with the § 727(a)(4)(A) claim in Mr. Schultz's personal bankruptcy, the bankruptcy court found that Mr. Schultz did not knowingly and fraudulently omit the Rolex watch and Bitcoin account from his schedules due to his mental disabilities. But based upon the same record, the court found that Mr. Schultz's undervaluation of the customer list was knowing and fraudulent. Although the court explained its latter decision was based on Mr. Schultz's commission versus an omission, there is no evidence in the record that allows us to reconcile the bankruptcy court's inconsistent findings.

The record shows that Mr. Schultz's personal bankruptcy and that of JWS were filed within a week of each other. There is no evidence that shows Mr. Schultz had a different state of mind when he filed JWS's petition or that he was acting with any greater clarity at the time he valued JWS's customer list. Rather, there is ample undisputed evidence of

25

Mr. Schultz's mental disorders in the record and their impact on his memory and day-to-day functioning. The record shows that he had trouble filling out simple forms. His personal bankruptcy petition and that of JWS were complex. He had trouble with remembering — a significant portion of answers during trial was that he did not remember. The record also shows that he relied heavily on other people to help him — Mr. Rucker, his accountant for his books; Sarah, his assistant for help with his filing and that of JWS; Ms. Morales for help with his bankruptcy filings; and ultimately his friend Mr. Ngwu for help with valuing his customer and lead lists. These facts are consistent with the testimony of Mr. Schultz, Ms. Morales, and Ms. Morgan.

Moreover, Mr. Schultz's undisputed testimony was that he initially had no memory of valuing the customer and lead lists. Only later did he remember contacting Mr. Ngwu. Even then, he did not remember when or any of the details, but his testimony showed that he relied on Mr. Ngwu's opinion of the $0.10 per-email value. While we do not know whether Mr. Ngwu's opinion was correct or incorrect based on the evidence in this record, generally, "[a] false statement resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent.'" *In re Roberts*, 331 B.R. at 884.

In sum, the bankruptcy court's finding of a knowing and fraudulent intent was implausible and clearly erroneous.

**C. The bankruptcy court did not err in finding that Plaintiffs failed to meet their burden of proof for denial of discharge under § 727(a)(5).**

Section 727(a)(5) provides the court shall grant the debtor a discharge, unless—

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

The objecting party bears the burden of proof under § 727(a)(5) and "must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of assets." *Retz*, 606 F.3d at 1205. Once the creditor has established a prima facie case, "the debtor must offer credible evidence regarding the disposition of the missing assets." Id.

In their cross-appeal, Plaintiffs contend that they met their burden of persuasion on their § 727(a)(5) claim and thus the bankruptcy court erred. Plaintiffs explain that Mr. Rucker testified about a $250,000 withdrawal by cashier's check from Mr. Schultz's account on February 4, 2015 for "advertising." According to Plaintiffs, this large withdrawal took place about a year before the bankruptcy. They contend that Mr. Rucker testified

27

that he did not know who the cashier's check was written out to, and no further explanation was provided about the amount. When questioned about the $250,000 cashier's check, Mr. Schultz declined to answer and deferred to his accountant "[a]gain my accountant can tell you that. I don't - I don't do the books." Plaintiffs maintain that "[c]ulpability under Section 727(a)(5) is on a strict liability basis as, short of explaining where the assets went, it contains no defense to an unexplained loss or deficiency." *Grassman v. Brown (In re Brown)*, 570 B.R. 98, 119 (Bankr. W.D. Okla. 2017).

We are not persuaded by Plaintiffs' arguments. Plaintiffs alleged "on information and belief" that Mr. Schultz had a net worth in excess of $4 million during the later stages of the partnership, or July 2015, and then allegedly became insolvent. The first step in prevailing under § 727(a)(5) is to establish that the debtor owned identifiable assets of substantial value which were not included in the bankruptcy estate.

Mr. Schultz provided all his 2014, 2015, and 2016 personal and corporate tax returns, business financial records recorded in Quick Books, and bank statements to the chapter 7 trustee in his individual case and that of JWS, and to Plaintiffs. None of the documentation showed that he had a positive net worth of $4 million dollars. Rather, as the bankruptcy court noted, Plaintiffs' primary evidence was that Mr. Schultz and JWS made a lot of money in 2016 and 2017, yet wound up filing bankruptcy in 2017.

Although Mr. Schultz made a lot of money, his 2015 tax returns

28

showed he grossed $2.9 million, but had a net income of $372,992. In 2016, Mr. Schultz grossed $2.8 million and had a net income of $268,632. Moreover, the evidence shows that Mr. Schultz's taxable income rose from $275,699 in 2014 to $353,278 in 2015. The evidence also shows that his 2016 income from JWS was $268,632, but was offset by loss of another of his subchapter S corporations, Brave Knight, which reported a loss of $517,264.

Mr. Rucker, who keeps Mr. Schultz's books and does his personal and business tax returns, testified extensively at trial. The bankruptcy court acknowledged that Mr. Schultz could not explain some of the withdrawal entries, but he testified that he left a lot of the categorization to his accountant, Mr. Rucker. Mr. Rucker corroborated Mr. Schultz's testimony, explaining how he sorted various deposits and withdrawals from JWS's accounts.

Plaintiffs believe they met their burden of proof since neither Mr. Schultz nor Mr. Rucker explained the $250,000 cashier's check, which was categorized as an advertising expense, apparently since they do not know who the check was made out to. Plaintiffs are mistaken as to what constitutes a "satisfactory" explanation. "At a minimum, a 'satisfactory' explanation must say what actually happened to the assets and must be believable." *Kane v. Chu (In re Chu)*, 511 B.R. 681, 687 (Bankr. D. Haw. 2014). Here, not only was documentary evidence produced, but Mr. Rucker corroborated Mr. Schultz's testimony in great detail. Further, there is no

29

indication in the record that Mr. Rucker or Mr. Schultz withheld any information about JWS or Mr. Schultz's business dealings.

Section 727(a)(5) "does not require that the loss or other disposition of the asset be proper; it requires only that the explanation satisfactorily describe or account for the disposition." *Ward v. Thompson (In re Thompson)*, BAP No. CC-08-1265-MoMkH, 2009 WL 7751298, at *5 (9th Cir. BAP Apr. 20, 2009); *see also In re Chu*, 511 B.R. at 687 (§ "727(a)(5) does not require that the explanation itself be meritorious, or that the loss or other disposition of assets be proper; it only requires that the explanation satisfactorily account for the disposition."). The *Chu* bankruptcy court explained: "[t]his definition of 'satisfactory' is consistent with the basic principle that section 727 must be interpreted in favor of the debtor." *In re Chu*, 511 B.R. at 687. Accordingly, even if the propriety of the $250,000 transaction could be questioned, on this record, it is plausible that it was used for advertising. Based on our review of the record, the bankruptcy court's decision to grant Mr. Schultz a discharge under § 727(a)(5) was not clearly erroneous.

## CONCLUSION

For the reasons stated, we REVERSE the bankruptcy court's denial of Mr. Schultz's discharge under § 727(a)(4)(A) via § 727(a)(7), and AFFIRM its decision to grant Mr. Schultz a discharge under § 727(a)(5).